[No. 13751. Department Two. May 19, 1917.]

QUILP GOLD MINING COMPANY, *Appellant*, v. REPUBLIC
MINES CORPORATION *et al.*, *Respondents*, IMPERATOR
QUILP COMPANY *et al.*, *Defendants.*[1]

MINES AND MINERALS—LOCATIONS—EXTRA LATERAL RIGHTS—STATUTES. Parties dealing with mining locations must bring themselves within the conditions prescribed by Congress for the acquisition of extra lateral rights, or be content with the minerals below the surface location.

SAME—LOCATIONS—EXTRA LATERAL RIGHTS—END AND SIDE LINES —RIGHT TO FOLLOW DIP—STATUTES. Under U. S. Rev. Stat. § 2319 *et seq.*, the end lines of a mining location must be projected parallel with each other and cross-wise of the general course of the vein within the surface limits of the location, and limit the extra lateral rights that may be acquired to so many feet of the length of the vein; but the side lines need not be parallel to each other, and whenever the top or apex of a vein is found within the surface lines extended vertically downward the vein may be followed outside the side lines; hence the end lines are not necessarily those marked on the

[1]Reported in 165 Pac. 57.

diagram as such, and if the apex of the veins crosses one end line and one side line there is the right to follow the vein on its dip beyond the side lines as marked on the map.

SAME — LOCATIONS — EXTRA LATERAL RIGHTS — CONTRACTS—CONSTRUCTION. Where two mining locations overlapped, the southeasterly corner of the prior location, known as the S. claim, being imposed upon the northwesterly corner of the junior claim, known as the Q. claim, so that the westerly line of the junior claim as patented by the government was not a straight line, but contained a jog to go around the southeasterly corner of the prior claim, a stipulation for the settlement of litigation over extra lateral rights which provided for the conveyance of "all ore bodies lying east of the west line of the Q. claim extended down vertically, and lying south of the north end line of the Q. claim extended down vertically, and which may apex within the lines of the S. claim," must be construed to call for the conveyance of all ore bodies apexing within the lines of the S. claim which lie east of the entire westerly crooked line of the Q. claim, and not merely those that lie east of that part of its westerly line from its northerly line to the southeast corner of the S. claim; since the parties to the stipulation must have had in view their statutory rights as provided by the mining law.

Appeal by plaintiff from a judgment of the superior court for Ferry county, Pendergast, J., entered March 22, 1916, in favor of the plaintiff, in an action for equitable relief, tried to the court. Reversed.

*Voorhees & Canfield,* for appellant.
*A. J. Laughon,* for respondents.

Holcomb, J.—This is an appeal from parts of a judgment and decree in an action brought by appellant against the Republic Mines Corporation and the other respondents and defendants claiming under it, to establish the ownership of appellant in and to the Quilp Lode Mining Claim, government survey No. 375, in and to all lodes, veins, ores, minerals, ore bodies and deposits of ore lying within the surface boundaries of the Quilp Lode Mining claim, extended vertically downward, and to declare that respondents and defendants have no right, title, estate, interest, claim or right of possession therein, and to enjoin and restrain them from asserting

any right therein and from entering or trespassing thereon or mining or removing the ores therein, and to quiet the title of the appellant in all ore bodies of every description lying east of the west line of the Quilp Mining claim, extended vertically downward and lying south of the north end line of the Quilp Mining claim, extended down vertically and which may apex within the lines of the Surprise Lode Mining claim, and to compel the execution and delivery of a deed of conveyance by respondents to appellant of all the ore bodies above described, according to the terms and conditions of a certain contract made and entered into between appellant and the Republic Mines Corporation or Imperator Company.

The pleadings and issues in the case are very multifarious and intricate, some of them being immaterial or of only incidental importance as the case comes here and in view of our disposition of the case. Upon the trial of the action, the court entered a decree in favor of the appellant generally, but containing certain exceptions and provisions, from which appellant prosecutes this appeal.

Appellant produced proofs to sustain substantially the following facts: For many years prior to the month of October, 1912, appellant had been, and ever since has been, the owner of the Quilp Lode Mining claim, survey No. 375, in Ferry county, Washington, and during such time the Republic Mines Corporation and its successors in interest have been the owners of the Lone Pine, Last Chance, and of the Surprise Lode Mining claim, survey No. 363, a prior location and claim in that county. The Quilp and Surprise claims overlap in their surveys. The relative situation of the two claims is shown by the following map or diagram, to which reference is made.

This diagram shows the courses and distances of the end and side lines of each claim, the location of the corners thereof, and the amount of the two claims that are in conflict. The area in conflict as to location on the surface is the equilateral figure A, B, C, 3 on the diagram, which area was conveyed by patent from the government to the Surprise Lode Mining claim and was specially excepted from the grant in the patent

from the government to the Quilp Lode Mining claim. But
this territory is not in dispute here and does not include any
of the ore bodies in dispute. During the year 1910, appel-
lant had given an option or bond upon the Quilp Lode Mining
claim to one J. L. Harper, by whom it was assigned to de-
fendant Imperator Quilp Company, hereinafter called the
Imperator Company. In working this bond within the Quilp
Lode Mining claim, the Imperator Company, in running a
tunnel from the south in the four hundred foot level of the
Quilp Lode Mining claim, encountered a body of ore on the
four hundred foot level. The tunnel and the ore encountered,
marked "stopes," are approximately located on this diagram.
On August 20, 1912, the Imperator Company, being then
in default upon its bond to appellant, the latter declared the
bond forfeited and the right of the Imperator Company within
the Quilp Lode Mining claim terminated. Previous to this
time, the Republic Mines Corporation had begun the exca-
vation of an incline shaft north of the north end line of the
Quilp claim, the location of which is indicated upon the
diagram.

In the summer of 1912, appellant was informed that the
Republic Mines Corporation had drifted into, and was taking
out and removing ores at, the 600-foot level of the Quilp,
which ores were taken from within the vertical bound-
aries of the Quilp Lode Mining claim. Believing that it
was the owner of this ore body which was being removed by
the Republic Mines Corporation, appellant directed the
prosecution of an action to restrain and enjoin the Republic
Mines Corporation from mining or extracting ores from
within the surface lines of the Quilp Lode Mining claim ex-
tending vertically downwards. This suit, which was subse-
quently brought, was referred to in the trial of the action as
the apex suit. The Republic Mines Corporation, at this
time, and the Imperator Company, when being operated,
were both under the management of J. L. Harper.

When Harper was advised that the appellant was about to begin an action against the Republic Mines Corporation to enjoin it from taking out and removing the ores from within the Quilp Lode Mining claim, the Imperator Company, at his direction, commenced an action in the superior court of Spokane county on October 15, 1912, against the Quilp Gold Mining Company for the recovery of the sum of $410,000, which action was referred to in the trial as the fraud action. On August 31, 1912, the Quilp Company had commenced an action in the superior court of Spokane county against Harper, the Imperator Company, and the North Washington Power & Reduction Company, another Harper corporation, for the sum of $4,100, claimed to have been due as royalties under the first bond given by the Quilp Company to Harper and held by the Imperator Company, and not paid to the Quilp Company in accordance with the terms of the bond, as was contended by the Quilp Company. This action was pending at the time of the commencement of the apex suit. The apex suit referred to was begun on October 17, 1912. The question of the ownership of the ores, then being taken out and removed by the Republic Mines Corporation and Harper from within the surface lines of the Quilp claim extended vertically downward, was therein involved. The plaintiff in that action, appellant here, claimed the same by reason of its ownership of the ground, and the defendant Republic Mines Corporation set up an ownership in the ore body itself by reason of the alleged fact that the vein wherein the ore body was situated had its apex within the surface lines of the Surprise claim, and that, therefore, the Republic Mines Corporation, under the doctrine of extra-lateral rights, had a right to follow and remove these ores wheresoever the same should be situated. In the apex suit, the plaintiff further demanded judgment for $100,000 damages for trespass upon the Quilp claim by the defendants. The apex suit came on for hearing upon a temporary injunction during the pendency of the action, and was partially heard by the court upon oral testi-

mony and such proceedings were had that, on November 20, 1912, an order was entered temporarily restraining and enjoining the Republic Mines Corporation from taking or removing any such ores pending the trial of the action upon the merits. Some of the antecedent facts are here recited as tending to show the situation existing at the time of the execution of the contract sued upon and their bearing thereon.

While these various actions, except the present one, were pending, and on May 2, 1913, a contract was entered into between the Republic Mines Corporation, the Imperator Company, and the appellant, which is the contract upon which appellant bases this action. In this contract, after reciting the ownership of the Quilp and Surprise claims and their location with reference to each other, and the existence of the three several controversies and pendency of the three several suits, and the desire of each and all to settle all controversies, the parties agreed: (1) That the Imperator Company would pay the Quilp Company certain sums of money on or before January 1, 1914, with other deferred payments, and that, upon such payment, the Quilp Company would execute and deliver to the Imperator Company a good and sufficient deed of conveyance of the Quilp Lode Mining claim, with all the dips, spurs, angles, etc., together with certain personal property; (2) that, if the Imperator Company should fail to make any payment within a time specified, then the contract should become forfeited, and all payments made by the Imperator Company prior to such forfeiture should be forfeited to the Quilp Company as liquidated damages; (3) that the Imperator Company might, so long as it complied with the contract, enter upon the Quilp claim and mine and work the claim and extract ores, provided that, if it so did, it should pay plaintiff, Quilp Company, as royalty, twenty per cent of all net mill or smelter returns and fifty cents per ton flat rate upon said ore extracted from said Quilp claim; (4) that the Imperator Company should cause the smelter or mill treating said ores to send royalties to

the Quilp Company at its office, and should cause the mill or smelter to send smelter returns to the Quilp Company; (5) that the royalties paid to the Quilp Company should apply toward the extinguishment of the purchase price of the claim. The sixth paragraph is not material. (7) It was agreed by the Imperator Company and the Republic Mines Corporation, with the consent of the Quilp Company, that the Republic Mines Company might enter into all that part of the Quilp claim which lay north of a line drawn parallel with the south end of the Surprise claim and running east and west across the Quilp claim and intersecting the east line of the Surprise claim at a point 142 feet northwesterly from corner No. 4 of the Surprise claim, and might mine, extract, mill and smelt the ores therefrom to any depth in following the vein during the life of the agreement, upon payment to the Quilp Company of a royalty of twenty per cent of the net smelter returns and fifty cents per ton flat rate for all ores so mined, and that the mills or smelters should send the royalty to the Quilp Company at its office, and the royalty should apply upon the purchase money the same as if the ore had been mined and smelted by the Imperator Company. (8) It was agreed that the Republic Mines Corporation would commence work and would mine or smelt from the territory agreed upon not less than 750 tons of ore per month until all moneys due under the contract should have been paid, and if it failed to mine, ship, mill or smelt said tonnage for a period of two months, then it should forfeit its right to occupy and operate the territory. (9) The Republic Mines Corporation agreed that, in case it should fail to mine, extract, mill and treat ores in accordance with the contract to such an extent that its rights thereunder should be forfeited under the provisions heretofore set forth, then, upon such forfeiture, it would, by good and sufficient deed executed by it, convey to the Quilp Company all ore bodies of every description lying east of the west line of the Quilp Mining claim extended down vertically, and lying south of the north line of the Quilp

Mining claim extended down vertically, and which may apex within the lines of the Surprise Lode Mining claim. The ninth paragraph of the contract is the important and critical portion thereof.

By the 20th paragraph, is was agreed that all the suits and actions theretofore mentioned then pending between the various parties should be dismissed with prejudice and without costs to any of them, and that the injunction then existing against the Republic Mines Corporation in the suit of the Quilp Company against it should be dissolved, and the Quilp Company and its bondsmen exonerated and released from all claims for damages. By the 21st paragraph, it was agreed that every clause, covenant and condition in the agreement should extend to, and be binding upon, the successors and assigns of the respective parties.

Upon the execution of this contract, stipulations for the dismissal with prejudice of the suits pending were executed, and judgments of dismissal with prejudice and without costs were entered. The Imperator Company entered into possession of the Quilp claim generally, and the Republic Mines Corporation began to mine ore from that portion of the Quilp claim described in paragraph 7 of the contract and which is referred to by the parties and in the brief as the disputed territory. On February 13, 1912, the Republic Mines Corporation, then owing to its miners some $14,000 unpaid labor bills, had entered into an agreement with the miners by which its property was being operated by a trustee under a contract to disburse the money derived from the mining operations in certain specified ways. The royalties on the ores extracted from the Quilp claim, both in and outside the disputed territory, were regularly paid the Quilp Company, but no payment other than the royalties was ever made to the Quilp Company.

On August 15, 1913, the Republic Mines Corporation and the Imperator Company made a mining bond to J. L. Harper, under which their interest under the contract of May

2, 1913, together with the Surprise claim and other claims, was agreed to be conveyed to Harper for $600,000, and thereupon Harper went into the full possession of the Quilp claim. Thereafter the Republic Mines Corporation was adjudged to be insolvent and a receiver was appointed, and later, in a bankruptcy proceeding, it was adjudged to be bankrupt by the United States district court, and a trustee in bankruptcy appointed. On June 19, 1914, the stockholders of the Republic Mines Corporation passed a resolution reciting that the contract of May 2, 1913, was invalid as to it for want of authorization or notification by the stockholders of the corporation, and rejected and disaffirmed the contract and caused notice of their action to be sent to respondent Bailey, then trustee in bankruptcy of the Republic Mines Corporation, and to the Quilp Company. Soon after receiving notice of this action by the stockholders of the Republic Mines Corporation, respondent Bailey placed a bulkhead in the tunnel leading from the Quilp shaft to the disputed territory, thereby excluding appellant from that portion of the Quilp claim, and ever since has claimed title to these ore bodies adverse and superior to the contract of May 2, 1913. In August, 1914, he refused to remove this obstruction or permit its removal.

By their answers, the defendants made several defenses: (1) They denied that the Republic Mines Corporation executed the contract because of a want of ratification or authorization thereof by the stockholders. (2) They averred that the contract was fraudulently entered into and was a fraud on the rights of the Republic Mines Corporation and its successors in interest; that (3) the contract was so unconscionable, harsh, and unjust that the appellant should be denied relief or specific performance under it; that (4) the contract was without consideration because, in truth, the ledge from which the ore was being extracted had its apex within the surface lines of the Surprise claim. These defenses were met by denials and by plea of ratification and estoppel by con-

duct as to defenses one and two, and by failure to do equity as to defense three.

Upon the trial of the cause, the court, with ample evidentiary support, upheld the execution of the contract, its honesty and the absence of fraud, its fairness and enforcibility, the adequacy of the consideration therefor, and the default of the defendants thereunder, and granted appellant generally the relief demanded, and decreed that the respondents convey to appellant the body of ore within the disputed territory lying within the Quilp claim north of a line 142 feet north of the south end of the Surprise claim and parallel with the southern line projected. The court, however, in the decree, found that the vein containing the ore body to be conveyed to appellant dips towards the east and will in all likelihood, on its dip and in its downward course, be found to pass through and beyond indefinitely the vertical plane extending through the easterly side line of the Quilp claim; and thereupon entered a decree which cuts the ledge in question into three segments, the first being from the apex of the ledge to the line B C extended vertically downward (see diagram), which segment is awarded to respondents, and which is undoubtedly correct; the second being from the line B C to the line from corner No. 4 of the Surprise claim to corner No. 2 of the Quilp claim, extended vertically downward, which was awarded to appellant; and the third being from the last mentioned line easterly to the utmost depth of the ledge, which was awarded to the respondents. The disputed territory as to surface area is, therefore, that south of the projected line from a point 142 feet north of the south end line of the Surprise claim, parallel therewith and extended vertically downward and east of a line from point B to corner 2 of the Quilp claim. The court further decreed that the Quilp claim is subject to an easement in favor of the respondents of a right of way across the Quilp claim to the territory lying easterly of the Quilp claim, with the right of ingress, egress,

15—96 WASH.

and regress through the same for the purpose of removing ores from the third segment. The court further undertook to establish the surface boundaries of the Surprise claim and Quilp claim, and found the location and dip of the vein on the surface, and undertook to establish a new end line of the Surprise claim erected at a point 142 feet northerly from the point B on the line B C, where the lode appears to cross the east side line thereof, all of which appellant contends is wholly beyond the issues and the evidence in the action and is erroneous, and from which it appeals.

Starting from the proposition that it was found and determined that the Republic Mines Corporation had not complied with the contract of May 2, 1913, that the contract was enforcible and not founded in fraud or unconscionable, and that the corporation had forfeited its rights under the contract, which adjudications respondents have not attacked, we observe by paragraph 9 of the contract that, upon such forfeiture, the Republic Mines Corporation was required to give a good and sufficient deed, executed by it, conveying to the Quilp Company all ore bodies of every description *lying east of the west line of the Quilp Mining Claim extended down vertically, and lying south of the north end line of the Quilp Mining claim extended down vertically, and which may apex within the lines of the Surprise Lode Mining claim.* The only question to determine, then, is what is the true construction and meaning of the foregoing italicized description. It is conceded that there is an ore body extending below the Quilp Mining claim the apex of which is within the lines of the Surprise Mining claim some distance northerly of corner 3 of what was originally the Quilp Mining claim. The dip of that lode from its apex seems to have been southerly and easterly, and to have struck the easterly line of the Surprise claim about 142 feet in distance north of point B or corner 4 of the Surprise claim.

In dealing with this question we must keep in view that we are dealing with contractual rights of the parties, and also

that the parties, in contracting with reference to the matter, had in view their statutory rights as provided by the mining statutes of the United States. Congress prescribed the conditions upon which extra-lateral rights might be acquired; and a party dealing with mining locations necessarily must bring himself within those conditions or else be content with simply the mineral beneath the surface of his own territory. These mining claims or rights are acquired by virtue of the act of Congress of May 10, 1872, found in Revised Statutes, § 2319 and following, which are the statutes in force today. These statutes had been thoroughly and plainly construed by decisions of the United States supreme court and their applications were well known. Under these statutes, the end lines of a mining claim are required to be parallel. The side lines are not required so to be. The end lines of a mining location are required to be projected parallel with each other and cross-wise of the general course of the veins within the surface limits of the location, and whenever the top or the apex of the vein is found within the surface lines extended vertically downwards, the vein may be followed outside of the vertical side lines. The end lines are not necessarily those which are marked on the map or diagram of the location as such, but they may be projected at the extreme points where the apex leaves the location as marked on the surface. *Iron Silver Min. Co. v. Elgin Mining & Smelting Co.,* 118 U. S. 196; *Del Monte Mining & Milling Co. v. Last Chance Mining & Milling Co.,* 171 U. S. 55; *Clark v. Fitzgerald,* 171 U. S. 92; *Walrath v. Champion Mining Co.,* 171 U. S. 293. These provisions of the law the parties to the contract of May 2, 1913, were presumed to know, and in fact, from the nature of the provisions of their contract, we assume they did actually know.

The trial court took the view, as shown by his notes to the decree in this case, that the Surprise and Quilp claims have but one common identical side line and boundary, namely, the line B C described on the diagram, which line B C is in part

the east boundary side line of the Surprise lode and in part the west boundary side line of the Quilp, and that the parties contracted with reference thereto, because they recited in the contract that the workings were to be north of the point where the Surprise claim crossed the west side line of the Quilp claim. But the court evidently erred in supposing that the parties contracted with reference to the ore bodies only lying east of the line B C. For one thing, as was said in the *Del Monte Mining & Milling Company* case, *supra*, these side lines may be curved lines or irregular lines; and by referring to the diagram in this case, it will be seen that the established westerly line of the Quilp claim cannot logically be construed to be anything but a broken or irregular line extending northerly, with westerly bearings, from corner 2 at the south to the point A, where it intersects the Surprise claim end line; thence easterly to the point B, which is corner 4 of the Surprise claim end line as established and granted in its patent; thence northerly to the point C in the north end line of the Quilp claim, and there terminates. To be consistent, this must be considered the entire westerly line of the Quilp claim. The north end line then begins at the intersecting point of the Surprise claim side line, point C, and extends easterly to corner 4. The easterly side line is then the straight line running southerly, with a bearing to the east, to corner 1 of the Quilp claim. Thus the Quilp claim has two parallel end lines as required by the statute, and two side lines, one of which is presumably a straight line on the easterly side, and the other a broken, irregular line on the westerly side. We can see no uncertainty or ambiguity in the language of the contract describing the lines and the ore bodies to be conveyed.

We thus construe the contract as providing most comprehensively in paragraph 9 that all ore bodies of every description lying east (or easterly) of the west (or westerly) line of the Quilp claim extended down vertically, and south (or southerly) of the north end line of the Quilp claim extended down vertically, include all ore bodies within the Quilp claim

east of the line from 2 to A, A to B, and B to C, and south of the line from C to corner 4, and necessarily, of course, south of the line from A to B. This is in harmony with the decisions in *Del Monte Mining & Milling Co. v. Last Chance Mining & Milling Co., supra,* and *Iron Silver Mining Co. v. Elgin Mining & Smelting Co., supra,* and other decisions of the supreme court of the United States.

It is evident that some of the litigation pending at the time of the execution of the contract here involved presented the question of where the right of the Republic Mines Corporation as the owner of the Surprise claim, and of the vein which has its apex therein, terminated. It is contended here, and no doubt was in the other litigation which was ended by the contract, that the east side line of the Surprise claim was the *side* and not the end line with reference to its vein, and that it had the right to pursue the vein and all its dips, spurs, and angles indefinitely so far as it might extend, although it might pass under the entire length of the Quilp claim. A glance at the diagram showing the apex and trend of the Surprise vein shows that it would be indeed difficult to determine whether the east side line of the Surprise claim was in fact a side line or the end line, for the vein strikes the east side line in its trend from the north at a sharp or acute angle. Under the Federal statute under which mining claims are located, there is no command that the side lines shall be parallel, but it is required, and it has been determined by the supreme court of the United States, that the requisition that the end lines shall be parallel was for the purpose of bounding the underground extra-lateral rights which the owner of the location may exercise. As was said in the *Del Monte* case, *supra:*

"He may pursue the vein downwards outside the side lines of his location, but the limits of his right are not to extend on the course of the vein beyond the end lines projected downward through the earth. His rights on the surface are bounded by the several lines of his location, and the end lines

must be parallel in order that going downwards he shall acquire no further length of the vein than the planes of those lines extended downward enclose. If the end lines are not parallel, then, following their planes downward his rights will be either converging and diminishing or diverging and increasing the farther he descends into the earth. In view of this purpose and effect of the parallel end lines it matters not to the *prior* locator where the end lines of the *junior* location are laid. No matter where they may be, they do not disturb in the slightest his surface or underground rights."

And it was further said in that case that, if the apex of a vein crosses one end line and one side line of a lode mining claim as located thereon, there is the right to follow the vein on its dip beyond the side line; citing other cases.

Respondents quote from the above case as follows:

"Every vein whose apex is within the vertical limits of his surface lines passes to him by virtue of his location. He is not limited to only those veins which extend from one end line to another, or from one side line to another, or from one line of any kind to another, but he is entitled to every vein whose top or apex lies within his surface lines. Not only is he entitled to all veins whose apexes are within such limits, but he is entitled to them throughout their entire depth, 'although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations.' In other words, given a vein whose apex is within his surface limits he can pursue that vein as far as he pleases in its downward course outside the vertical *side lines*."

But respondents do not quote the next paragraph of that decision as follows:

"But he can pursue the vein in its depth only outside the vertical *side lines* of his location, for the statute provides that the 'right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges.' "

And the court continues its limitation as follows:

"This places a limit on the length of the vein beyond which he may not go, but it does not say that he shall not go outside the vertical side lines unless the vein in its course reaches the vertical planes of the end lines. Nowhere is it said that he must have a vein which either on or below the surface extends from end line to end line in order to pursue that vein in its dip outside the vertical side lines. . . . The locator is given a right to pursue any vein, whose apex is within his surface limits, on its dip outside the vertical side lines, but may not in such pursuit go beyond the vertical end lines. And this is all the statute provides. Suppose a vein enters at an end line, but terminates half way across the length of the location, his right to follow that vein on its dip beyond the vertical side lines is as plainly given by the statute as though in its course it had extended to the farther end line."

It was further held in that case that the only exception to the rule, that the end lines of the location as the locator placed them established the limits beyond which he may not go in appropriation of a vein along its course or strike, is where it is developed that in fact the location has been placed not along, but across the course of the vein. In such case, the law declares that those the locator calls his side lines are his end lines, and those which he calls the end lines are in fact side lines, and this upon the proposition that it was the intent of Congress to give to the locator only so many feet of the length of the vein, that length to be bounded by the lines which the locator has established as his location.

Now it must be apparent that there was considerable dispute and controversy as to whether the Republic Mines Corporation, the owner of the Surprise claim, was entitled to follow the vein which apexed within its claim any further than the located east side line of the claim, or might follow it and work it in its trend downward and to the south, to the south end line as located on the Surprise claim extended westerly. This situation was evidently the cause of the orig-

inal dispute and litigation between these parties.  But what-
ever was the reason for their controversies, under the broad
and comprehensive terms of the contract entered into, all the
ore bodies which apexed within its claim, lying east of the west
side line of the Quilp claim and south of the north end line of
the Quilp claim, indefinitely, so far as the owner (and its
successors and assigns) of the Surprise claim was concerned,
were to be conveyed unreservedly and become the property
of the appellant upon the default and failure of respondents
to perform the contract of May 2, 1913.  And this adjust-
ment was purely a matter of contract, regardless of the pre-
cise legal extra-lateral rights or terminal rights of the owner
of the Surprise lode, in full contemplation of all the condi-
tions, and with perfect competency so to contract.

With this construction of the contract, it is evident that
the court erred in decreeing that the appellant was entitled
to a conveyance of all ore bodies only lying east of the line
B C of the Quilp Mining claim.

The court seems to have granted and decreed to the Re-
public Mines Corporation and its successors the right of in-
gress and egress across that part of the Quilp claim to and
from the ore body included within the disputed territory, be-
cause of granting the right to that territory to the respond-
ents.  Respondents, not being entitled to the ore bodies lying
within that territory or beyond it easterly and southerly, are
not entitled to any right of way for ingress and egress to
and from the same.

The judgment or decree is reversed, with instructions to
enter a decree in favor of appellant, granting to it all the
right, title, interest and estate, claim and right of possession
to all the ore bodies the apex of which lies within the Sur-
prise claim, lying south of the north end line of the Quilp
Mining claim extended vertically down, and east of the west
line extended vertically down, determined to be the line from
the point where the north end line of the Quilp Mining claim

intersects the east side line of the Surprise Mining claim, thence along and coincident with the east side line from the above point of intersection to corner No. 4 of the Surprise Mining claim, thence along and coincident with the south end line of the Surprise Mining claim from corner No. 4 to the point of intersection with the west side line of the Quilp Mining claim as surveyed, and thence southerly along the west side line, as surveyed, of the Quilp Mining claim to corner No. 2 of the Quilp Mining claim; and that the respondents be enjoined and restrained perpetually from asserting any right therein, and from entering or trespassing thereon or mining or removing the ores therein; and quieting the title of appellant in all ore bodies of every description lying within the above described area as to its surface lines extended vertically downward.

Appellant will recover costs below and of appeal.

ELLIS, C. J., FULLERTON, MOUNT, and PARKER, JJ., concur.