JIM BUTLER TONOPAH MINING COMPANY *v.* WEST END CONSOLIDATED MINING COMPANY.

ERROR TO THE SUPREME COURT OF THE STATE OF NEVADA.

No. 249. Argued March 26, 27, 1918.—Decided June 10, 1918.

The end lines of a lode mining claim, in the sense of the mining law, are those which are laid across the vein to show how much of it in length is appropriated and claimed by the miner. All other lines are side lines.

To sustain the extralateral right, the end lines must be parallel and straight, but this is not required of the side lines.

A mining claim was laid out as a parallelogram 1500 by 600 feet, but with two diagonally opposite angles truncated so that what would have been end lines in the absence of the truncation were thereby shortened substantially, but less than one half. *Held,* that these shortened lines, which were straight and parallel, were the end lines within the meaning of the mining law and for the purpose of determining the extralateral right, and that the truncating lines were parts of the side lines.

The extralateral right is a creation of the federal mining laws and they alone must be looked to in defining it.

Where a single vein, whose apex is within the boundaries of the claim, in its descent separates into two limbs—one being the discovery vein

—which dip downward through the vertical planes of the side lines, the extralateral right, its other elements being present, applies to each. The findings showed a fissure vein with two dipping limbs whose course downward was substantial, regular and practically free from undulation. For 750 feet out of a total length of 1150 feet within the claim each was practically a separate vein with a distinct summit or terminal edge. For the remaining 400 feet the two were united and from the place of union mineralized rock continued upward for from 20 or 30 to 100 feet. There was no contention that a top or apex had been found elsewhere. *Held*, that it could not be said as a matter of law that there was no top or apex within the claim, in the sense of the mining law.

39 Nevada, 375, affirmed.

THE case is stated in the opinion.

*Mr. Curtis H. Lindley*, with whom *Mr. Hugh H. Brown, Mr. Wm. E. Colby* and *Mr. J. H. Evans* were on the brief, for plaintiff in error:

One of the essential elements of an apex is a "terminal edge"; and, when the vein turns over and dips in the opposite direction, the resulting anticlinal roll has no legal apex, as is held by all the authorities that have considered the question. *Iron Silver Mining Co.* v. *Murphy*, 3 Fed. Rep. 368, 371, 375; *Stevens* v. *Williams*, Fed. Cas. No. 13,413, pp. 40, 43; *Stewart Min. Co.* v. *Ontario Min. Co.*, 237 U. S. 350, 360; *Alameda Min. Co.* v. *Success Min. Co.*, 29 Idaho, 618, 630; *Eureka Cons. Min. Co.* v. *Richmond Min. Co.*, 4 Sawyer, 302, 311; *Duggan* v. *Davey*, 4 Dakota, 110; *Illinois Silver M. Co.* v. *Raff*, 7 N. Mex. 336; Costigan, Mining Law, 139; Barringer and Adams, Law of Mines and Mining, 442; Shamel, Mining, Mineral and Geolog. Law, 193, 194; Mines and Minerals, 27 Cyc. 537; Raymond, Glossary of Min. and Met. Terms., Trans. Am. Inst., M. E., Vol. IX, 102.

Section 2322 of the Revised Statutes does not justify the exercise of an extralateral right on the same vein on two downward courses and in opposite directions, since

the wording of the statute will not permit such a construction. This is especially true where the limb of the vein on which the discovery was made dips in the opposite direction from the limb in which the disputed ore bodies occur.

The westerly end line of the West End claim is a broken line, which is in contravention of the mandatory provision of the statute requiring end lines to be parallel and necessarily straight.

*Mr. W. H. Dickson*, with whom *Mr. S. S. Downer, Mr. A. C. Ellis, Jr.*, and *Mr. H. H. Atkinson* were on the brief, for defendant in error.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is a suit by the owner of two lode mining claims—the Eureka and the Curtis—to enjoin the owner of an adjoining lode claim—the West End—from exercising an asserted extralateral right in respect of a vein extending beneath the surface from the latter claim into the others. All the claims are patented and their ownership is conceded. The Eureka adjoins the West End on the south and the Curtis lies immediately south of the Eureka. The state courts, both trial and appellate, upheld the defendant's asserted right to follow the vein extralaterally, 39 Nevada, 375, and the plaintiff seeks a reversal of that decision on the theory that it is in contravention of the mining laws of Congress, in that (a) the end lines of the West End claim are not parallel and straight, and therefore an essential element of the right to follow the vein extralaterally is wanting, (b) this right can be exercised only in one direction, that is, beyond one side line, not both, and as the discovery vein [1] dips to the north the

---

[1] The discovery was on the northerly limb hereinafter described.

right can be exercised only in that direction, and (c) the facts specially found do not show that the top or apex of the vein is within the vertical limits of the West End claim.

For present purposes the West End claim may be described as having the form of a parallelogram 1500 feet in length from east to west and 600 feet in width from north to south, but with a small portion of the northeast corner cut off by a diagonal line and a somewhat larger portion of the southwest corner similarly cut off (see diagram, 39 Nevada, 389). Thus what would be the end lines of the parallelogram, if it were complete, are substantially shortened, but the major part of each remains. These shortened lines are not only parallel but straight. Are they the end lines of the claim in the sense of the statute? Or do its end lines consist of the shortened' lines and the diagonal lines? End lines in the sense of the statute are those which are laid across the vein to show how much of it, in point of length, is appropriated and claimed by the miner. All other lines are side lines. True, the end lines must be both parallel and straight, Rev. Stats., §§ 2320, 2322; *Walrath* v. *Champion Mining Co.*, 171 U. S. 293, 311, but it is not so with the side lines. They may have angles and elbows and be converging or diverging so long as their general course is along the vein and the statutory restriction on the width of claims is respected. *Del Monte Mining Co.* v. *Last Chance Mining Co.*, 171 U. S. 55, 84. Applying these tests to the bounding lines of the West End claim, we regard it as plain that the diagonal lines at the two corners are part of its side lines, and not of its end lines. In this respect the case is like *Walrath* v. *Champion Mining Co.*, *supra*, where in determining what was the northerly end line of the Providence claim (see diagram, 171 U. S. 298), the line g-h was held to be the true end line and the diagonal line f-g to be no part of it. Thus the objection that

the end lines of the West End claim are not parallel and straight is untenable.

What in mining cases is termed the extralateral right is a creation of the mining laws of Congress, and to learn what it is we must look to them rather than to some system of law to which it is a stranger. Besides, as Congress has plenary power over the disposal of the mineral-bearing public lands, it rests with it to say to what extent, if at all, the right to pursue veins on their downward course into the earth shall pass to and be reserved for those to whom it grants possessory or other titles in such lands. What it has said is this, Rev. Stats., § 2322:

"The locators of all mining locations . . . on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, . . . shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface-lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side-lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end-lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges."

It will be seen that the extralateral right so created is subject to three limitations. One conditions it on the presence of the top or apex inside the boundaries of the claim. Another restricts it to the dip or course downward, and so excludes the strike or onward course along the top or apex. And the last confines it to such outside parts as lie between the end lines continued outwardly in their own

direction and extended vertically downward.    But other-wise it is without limitation or exception and broadly includes "all veins, lodes, and ledges throughout their entire depth,"—one as much as another, and all whether they depart through one side line or the other. · Given two veins which in their descent pass, one through one side line and the other through the other side line, how could it be held that the right applies to one vein and not to the other, when the statute says "all veins . . . through-out their entire depth"? By what rule would a court be guided in making a selection between the two when the statute makes none?    And where a single vein, in its descent separates into two limbs which depart through the opposite side lines, on what theory could the right be sustained as to one limb and rejected as to the other? The terms of the statute, as we think, do not lend them-selves to any such distinctions, but, on the contrary, show that none such is intended.

In *Mining Co.* v. *Tarbet,* 98 U. S. 463, 467, this court in pointing out the intent of the statute said that "the end lines are to cross the lode and extend perpendicularly downwards, and to be continued in their own direction either way horizontally." And in *Del Monte Mining Co.* v. *Last Chance Mining Co.,* 171 U. S. 55, a case in which the statute was much considered, it was said, p. 88: "Every vein whose apex is within the vertical limits of his surface lines passes to him by virtue of his location. He is not limited to only those veins which extend from one end line to another, or from one side line to another, or from one line of any kind to another, but he is entitled to every vein whose top or apex lies within his surface lines.    Not only is he entitled to all veins whose apexes are within such limits, but he is entitled to them through-out their entire depth, 'although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side

lines of such surface locations.' In other words, given a vein whose apex is within his surface limits he can pursue that vein as far as he pleases in its downward course outside the vertical side lines." And again, p. 89: "The locator is given a right to pursue any vein, whose apex is within his surface limits, on its dip outside the vertical side lines, but may not in such pursuit go beyond the vertical end lines." In *Calhoun Gold Mining Co.* v. *Ajax Gold Mining Co.*, 182 U. S. 499, it was added, p. 508: "There are no exceptions to its language. The locators 'of any mineral veins, lode or ledge' are given not only 'an exclusive right of possession and enjoyment' of all the surface included within the lines of their locations, but '*of all veins, lodes and ledges throughout their entire depth,* the top or apex of which lies inside of such surface lines extended downward vertically.' A locator therefore is not confined to the vein upon which he based his location and upon which the discovery was made." And also, p. 509: "Blind veins are not excepted, and we cannot except them. They are included in the description 'all veins' and belong to the surface location."

We conclude therefore that, when the other elements of the extralateral right are present, it may be exercised beyond either or both side lines depending on the direction which the departing vein or veins take in their downward course.

So much of the special finding as bears on the character of the vein and the presence of its top or apex inside the vertical lines of the West End claim is as follows:

"The said vein does not on its upward course, or at its top or apex, outcrop or reach the present surface, but is covered or buried to a considerable depth by lava, locally known as and called 'Midway' andesite, which, after the formation of the vein, flowed over the then surface of the territory in which the vein exists; that at and for a distance of 360 feet westerly from where said vein

or lode crosses the easterly end line of said West End claim, which crossing is at a distance of 135 feet northerly from the southeast corner of said West End claim, there is a juncture or union between two limbs or sides of said vein, and from the summit of said juncture or union the downward course of one limb or side thereof is in a northerly direction, and the downward course of the other limb or side thereof is in a southerly direction; that there is a continuation upward from the summit of said juncture or union of said northerly and southerly dipping limbs or sides of said vein of ore and silver-bearing quartz or rock in place for a distance from 20 or 30 to more than 100 feet, and to what was the surface before the same was buried beneath the said lava flow; that such ore and silver-bearing quartz were deposited where the same are now found at the same time and during the same period that the main vein below was created, and from mineral-bearing solutions having the same source; that the dip is fairly conformable, and the strike or course of such upward continuation of ore and silver-bearing quartz is conformable to the dip and strike or course of said northerly dipping limb or side of said vein from the summit of said juncture downward, and the Court finds that said upward continuation is a part of said vein or lode; that thence westerly, and for a distance of 360 feet, the northerly and southerly dipping limbs, sides, or slopes of said vein do not unite or form a union or juncture in their upward course, but for that distance each of said limbs or sides has a separate and independent top or apex; that thence westerly, for a distance of 40 feet, the northerly and southerly dipping limbs, sides or slopes of said vein are again found in conjunction, as in the said most easterly 360 feet; that thence westerly, and until said northerly and southerly dipping limbs, sides, or slopes of said vein intersect with and cross said northerly side line of said mining claim, they do not unite or form a union or junc-

ture in their upward course, but for that distance [1] each of said limbs or sides has a separate and independent top or apex; that between said distance of 40 feet, where said northerly and southerly dipping limbs, sides, or slopes of said vein, as aforesaid, unite or form a union or juncture in their course upward, and said points on said northerly side line of said mining claim where, as aforesaid, said contra-dipping limbs, sides, or slopes of said vein respectively intersect said side line and cross the same and so depart from said mining claim, there are two points at which it appears that said contra-dipping limbs, sides or slopes of said vein on their upward course approach closely to a juncture or union but as to said contra-dipping limbs, sides or slopes of said vein at said two points actually forming a juncture or union on their upward course, the evidence is meager and unsatisfactory; that the point where the said northerly dipping limb or side of said vein departs from the said mining claim through the northerly side line thereof is 1120 feet westerly from the northeast corner of said claim, measured along the northerly side line thereof; that the point where said southerly dipping limb or side of said vein departs from said mining claim through the northerly side line thereof is 1142¼ feet westerly from the northeast corner of said claim, measured along the northerly side line thereof; that throughout said distance of 40 feet, where the contra-dipping limbs on sides of said vein are found in conjunction, as hereinbefore stated, there is a continuation upward from the summit of the juncture or union of said two limbs or sides of said vein of ore or vein quartz to what was the surface before the same was covered by the lava flow; that the dip or downward course of both the northerly and southerly dipping sides or limbs of the vein where the two are found in conjunction, as aforesaid, and also in the places where each, as aforesaid,

---

[1] Approaching 400 feet.

has its separate and independent top or apex, is regular and practically free from undulations; that the said southerly dipping limb or side of the vein in the easterly portion of the West End claim, that is to say, the easterly 360 feet thereof, has been developed from the top or summit of said juncture of said contra-dipping limbs to and beyond the southerly side line of said claim, or for a distance, measured on the slope or downward course of said southerly dipping limb or side, of 800 feet or thereabouts, the average dip there being 17 degrees from the horizontal; that the westerly portion, that is to say, the westerly 300 feet of said southerly dipping limb or side of said vein found in the West End claim, has been developed from its top to and beyond the southerly side line of said claim, or for a distance, measured on its slope or downward course, of 1000 feet or thereabouts, the average dip there being 30 degrees from the horizontal; that the average dip of said northerly dipping limb or side of said vein, so far as the same has been developed in its downward course, is 17 degrees from the horizontal; that said vein is a fissure vein; that there is a difference in the strikes or courses of said northerly and southerly dipping limbs of said vein of about 40 degrees; that at said places and throughout said distances, where said contra-dipping limbs of said vein are found to intersect and form a juncture, as aforesaid, there has been a mingling of the mineralizations of said two limbs of said vein within the angle beneath the juncture of the said two limbs; that at such places and throughout said distances the footwall of said two limbs of said vein, within the angle beneath their said juncture, by the process of replacement has been converted into mineralized quartz for considerable distances below said juncture, said replacement quartz extending from limb to limb."

Giving due effect to the finding, it is manifest that the vein in controversy is not a flat or horizontal vein or one

which would be practically horizontal but for a succession of rolls or waves in its elevation. On the contrary, it is shown to be a fissure vein with two dipping limbs whose course downward is substantial, regular and practically free from undulations. For 750 feet out of its total length of 1150 feet within the West End claim each limb is practically a separate vein with a distinct summit or terminal edge. For the remaining 400 feet the two limbs are united and from the po'nt of union the mineralized quartz or rock continues upward for from 20 or 30 to more than 100 feet, and this seems to answer all the calls of a summit or terminal edge. In these circumstances we hardly would be warranted in saying as matter of law that the vein has no top or apex within the claim in the sense of the statute. See *Stewart Mining Co.* v. *Ontario Mining Co.*, 237 U. S. 350.

It is well to remember, as this court has indicated in other mining cases, that to take from the discoverer a portion of that which he has discovered and give it to one who may have been led to make an adjoining location by a knowledge of the discovery is unreasonable.

The contention is not that the top or apex of this vein has been found elsewhere, but only that what is found in the West End claim is not such in the sense of the statute. "The law," as has been truly said, "assumes that the lode has a top, or apex, and provides for the acquisition of title by location upon this apex." Probably this assumption could not be indulged where the fact appeared to be otherwise, but it serves to show that the absence of a top or apex ought not to be adjudged in the presence of such a finding as we have here.

*Judgment affirmed.*