[No. 1318-43052-3. Division Three. March 4, 1976.]

SILVER SURPRIZE, INC., *Appellant*, v. SUNSHINE MINING COMPANY, *Respondent*.

2

*John L. Neff* and *Witherspoon, Kelley, Davenport & Toole,* for appellant.

*Leo J. Driscoll* and *Winston, Cashatt, Repsold, McNichols, Connelly & Driscoll,* for respondent.

GREEN, J.—This is a contract action[1] brought by the

---

[1]*See Silver Surprize, Inc. v. Sunshine Mining Co.,* 74 Wn.2d 519, 445 P.2d 334 (1968), holding that this state had jurisdiction over this proceeding because it was a contract action.

plaintiff, Silver Surprize, Inc., against the defendant, Sunshine Mining Co., to require defendant to account for ore removed from the "Yankee Girl Vein" (YGV) within plaintiff's mining claim or, alternatively, for cancellation of the contract. In defense, Sunshine asserts that, because it owns the extralateral rights to the YGV, that vein is not covered by the contract and, therefore, an accounting is not required. Alternatively, Sunshine contends the action is barred by statutes of limitation and laches. While the trial court refused to find that Sunshine owned extralateral rights in the YGV, it did find that the YGV was not subject to the contract and, even if it were, Sunshine acquired title to the ore removed by ouster of its cotenant, Silver Surprize, through adverse possession. Further, the court held the action was barred by statutes of limitation and laches and denied Silver Surprize's request to cancel the contract. Both parties appeal from a judgment of dismissal.

The factual background is as follows: Silver Surprize owns a mining claim in the Coeur d'Alene Mining District near Kellogg, Idaho. This claim is located near claims owned by Sunshine and borders other mining claims in which Sunshine has contractual interests:[2]

---

[2]Sunshine owns the Thin, Iron King, Sunshine, McKenzie, and McKenzie Fracture claims and entered into exploration agreements

4

In 1946, Silver Surprize and Sunshine entered into an exploration agreement. Under that agreement, Sunshine conveyed to Silver Surprize its interest in three small claims located in the upper section of the Silver Surprize group, reserving

> any *extralateral rights* within the exterior boundaries of said claims which Sunshine may have owned, in whole or in part, prior to the location of said claims.

(Italics ours.) In return, Silver Surprize conveyed an undivided one-half interest in the Surprize group to Sunshine, together with an unlimited right of surface and underground ingress and egress. Under this agreement Sunshine was to explore and develop the Surprize group as "in Sunshine's judgment is warranted as a sound mining venture." Gross receipts were to be shared equally between them after deductions for Sunshine's expenses. Sunshine was required to:

> furnish Surprize, either monthly or quarterly, statements of production and costs, together with general information as to the amount, location and character of the work performed.

Silver Surprize was given the right to inspect the underground work being performed.

Sunshine has never rendered an accounting to Silver Surprize, although it removed in excess of $2 million worth of ore from that part of the YGV located within the Surprize group of claims. When an accounting was demanded just prior to commencement of this action in 1965, Sunshine refused.

The assigned errors present four major issues:

1. Does Sunshine own extralateral rights in the YGV, thereby rendering the 1946 agreement inapplicable to that vein?

---

with Sunshine Consolidated covering the Hilda, Mary-E, Oslo, SCI No. 10, Red Umbrella, Rex, and Roberts claims, and Metropolitan Mines Corporation covering the Boston, Tough Going, and Utica claims.

2. If Sunshine does not own extralateral rights in the YGV, was that vein nevertheless excluded from the agreement?

3. If the YGV is covered by the agreement, did Sunshine acquire title to the ore removed through the ouster of its cotenant, Silver Surprize, by adverse possession?

4. Is the claim of Silver Surprize barred by statutes of limitation or laches?

## I. Does Sunshine Own Extralateral Rights to the YGV?

■ The rights of possession and enjoyment running to the locator of a mining claim are governed by the act of May 10, 1872.[3] This act provides:

> The locators of all mining locations made on any mineral vein, lode, or ledge . . . shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges.

30 U.S.C. § 26 (1971). The right to follow a vein outside the boundaries of one's own claim has come to be called "extralateral rights". *See* 2 C. Lindley, *Mines, American Law Relating to Mines and Mineral Lands* § 566, at 1252 (3d ed. 1914). Extralateral rights attach only to those veins which have their apex within the boundaries of a claim. The con-

---

[3] 30 U.S.C. § 26 (1971).

cept of extralateral rights is illustrated as follows:

In other words, once a claimant establishes the apex of a vein within the boundaries of his claim, he may follow that vein on its downward course (dip) outside the claim so long as he remains within the extension of the end lines of his claim.

A locator of a mining claim is presumed to own all ore within the boundaries of his claim extended downward vertically. *St. Louis Mining & Milling Co. v. Montana Mining Co.*, 194 U.S. 235, 239, 48 L. Ed. 953, 24 S. Ct. 654 (1904); *Calhoun Gold Mining Co. v. Ajax Gold Mining Co.*, 182 U.S. 499, 508, 45 L. Ed. 1200, 21 S. Ct. 885 (1901). Thus, one who asserts extralateral rights to a vein penetrating another's claim has the burden of proving that the vein has its apex within the boundaries of his claim. *Heinze v. Boston & M. Consol. Copper & Silver Mining Co.*, 30 Mont. 484, 77 P. 421 (1904); *Barker v. Condon*, 53 Mont. 585, 165 P. 909, 912 (1917); *Collins v. Bailey*, 22 Colo. App. 149, 125 P. 543, 548 (1912). This rule is firmly stated in *Consolidated Wyoming Gold Mining Co. v. Champion Mining Co.*, 63 F. 540, 550-51 (N.D. Cal. 1894):

> The respondent [surface owner] has the undoubted right to say to complainant [extralateral claimant], "Hands off of any and everything within my surface lines extending vertically downward, until you prove that you are working upon and following a vein which has its apex within your surface claim, of which you are the owner!"

Here, the trial court held that Sunshine failed to meet the substantial burden of proof required of an extralateral rights claimant.[4]

First, Sunshine contends that its extralateral right to the YGV was established by evidence sufficient to prove a surface apex in the Thin Claim and that entry of findings and conclusions to the contrary was error. We disagree.

The trial court found that Sunshine demonstrated the apex

of some vein which courses throughout the length of the Thin Claim.

. . . but Sunshine has failed to prove continuity of the vein mineralization or gangue between that apex on the Thin Claim and the Yankee Girl Vein seen between the 2700 and 3700-foot levels.

Challenged finding of fact No. 33. Sunshine attempted to prove continuity and identity between the claimed surface apex on its Thin Claim and the YGV between the 2,700- and 3,700-foot level by mineral samples taken from drill holes along the projected downward course of the YGV between the surface and the 2,700-foot level. The trial court characterized this evidence as "not too revealing," specifically finding that:

From reading the drill logs covering drilling above 2700 it is impossible to determine the configuration of the Yankee Girl Vein between the Yankee Girl adit and the 2700-foot level. Commencing with Hole 27-011 at the 2400-foot level to the surface, it is apparent that the vein

---

[4]Although for purposes of this opinion we need not determine whether the YGV is a "vein, lode or ledge" to which extralateral rights may attach, the trial court's findings based upon geological data, testimony of the experts, and prior judicial interpretation support the conclusion that the YGV between the 2,700- and 3,700-foot levels is a vein, lode, or ledge as understood by the "practical miner." *Eureka Consol. Mining Co. v. Richmond Mining Co.*, 8 F. Cas. 819 (No. 4,548) (C.C. Nev. 1877); *Iron Silver Mining Co. v. Cheesman*, 116 U.S. 529, 29 L. Ed. 712, 6 S. Ct. 481 (1886); *Alameda Mining Co. v. Success Mining Co.*, 29 Idaho 618, 161 P. 862, 865 (1916); *see Star Mining Co. v. Federal Mining & Smelting Co.*, 265 F. 881, 888-96 (9th Cir. 1920); *Last Chance Mining Co. v. Bunker Hill & S. Mining & Concentrating Co.*, 131 F. 579, 586-87 (9th Cir. 1904).

is irregular and very narrow. It likewise does not possess those characteristics which distinguish it and give it its identity between the 3700 and 2700-foot levels. There is no concentration of mineralized stringers that interlace, converge, or weave in and out. There are many isolated stringers in the area, so it is imperative that in showing continuity Sunshine clearly demonstrate a concentration of mineralized stringers or a continuous single fissure. Apparently at the higher levels we are dealing with one vein with precise boundaries. Whether it is continuous over this vast distance of nearly half a mile cannot be established by the interceptions of diamond drill holes, some of which are 800 feet apart. It requires a large amount of geological speculation to tie this extremely narrow band of mineralized rock for over a half a mile with an apex on the basis of these drill hole intercepts. There is no way of telling whether the drill holes intercept the same narrow vein or band of mineralization at the various levels as they could be discontinued at any number of horizons. The drill holes certainly do not show a vein configuration similar to that between the 3700 and 2700-foot levels, and without that showing it seems extremely difficult to tie a single fissure or very narrow band existing in the St. Regis rock between the 2700-foot level and the surface with the Yankee Girl Vein at depth.

Challenged finding of fact No. 34.

■ There is no established degree of continuity or identity which an extralateral rights claimant must show between an apex within the boundaries of his claim and the vein he is pursuing into an adjoining claim. The required showing of continuity and identity is dependent upon the facts of each case. *Gold, Silver & Tungsten, Inc. v. Wallace*, 104 Colo. 273, 280, 91 P.2d 975, 979 (1939). Here, the trial court was presented with mineral samples recovered from narrow drill holes often hundreds of feet apart between the surface and the 2,700-foot level. The recovered samples contain material common, not only to the YGV between the 2,700- and 3,700-foot levels, but throughout the Coeur d'Alene Mining District. The trial court summed up the difficulty of establishing an apex without further demonstrative evidence:

Nor has Sunshine mined down dip from the surface on the Yankee Girl Vein to reveal for certain its angle of dip and configuration. It is that fact which makes the case somewhat unusual as compared to the reported cases. In all of the latter cases there has been extensive work at or near the surface of the claim demonstrating the strike and dip of the vein. In addition, what geological projections were made weren't over such extensive distances as involved in this case. This case is very unusual in that Sunshine has mined the ore at the lower levels and projected up-dip for nearly half a mile in an attempt to tie their mining in with a surface apex in claims under its control.

Unchallenged finding of fact No. 35. Continuity and identity have been found to exist between a vein at depth and its surface apex based upon actual workings of the mine between those positions. In *Alameda Mining Co. v. Success Mining Co.*, 29 Idaho 618, 161 P. 862 (1916), the court observed, at page 636:

In the case at bar, it is proper to consider that the proof of the *actual working of the mine*, the way it was worked, what was found therein and the condition of the many open stopes and veins . . . *is certainly better evidence of the course*, dip, angles, spurs and character of the vein *than any expert testimony* that could be given.

(Italics ours.) On the other hand, continuity and identity will not be presumed over substantial unexposed distances. For example, in *Collins v. Bailey*, *supra*, the court refused to find continuity between an apex and a vein over an unexposed distance of 550 feet. Again, in *Heinze v. Boston & M. Consol. Copper & Silver Mining Co.*, *supra* at 487-88, the court said:

the plaintiffs have not by their operations so developed their own workings from the apex of their vein down to the disputed territory as to furnish substantial evidence that their claim is probably well founded. Indeed, while they concede that there is a vein in the defendant's ground dipping to the south, *their own contention is based exclusively upon the opinion of their engineers* that, if the vein having its apex in the Minnie Healy ground continues to dip at the same angle from certain

points where it is exposed in the upper levels in their workings, it will reach the point where the defendant is conducting its operations. *This is not sufficient to overcome the presumption that the defendant owns the ores found beneath its own surface. This presumption may not be overturned by speculative conjecture or even intelligent guess.*

(Italics ours.)

Here, the area between the surface and the 2,700-foot level is unworked and unexposed. The only physical evidence of continuity and identity over this distance are the drill-hole samples taken at intervals of up to 800 feet. These samples show a pattern of mineralization common to the entire mining district, and not unique to the YGV. Consequently, the trial court properly found that Sunshine failed to meet its burden of proving a surface apex to the YGV.

Second, Sunshine contends that the trial court's unchallenged finding that the apex of the YGV "undoubtedly lies somewhere" on property owned or controlled by Sunshine is sufficient to establish its extralateral right to the vein. We disagree.

In support of this contention, Sunshine analogizes its position to that of a claimant of extralateral rights under a "blind apex." A "blind apex" is one that does not outcrop, but lies below the surface. However, such an apex must be proved with the same degree of certainty as a surface apex. *Flagstaff Silver Mining Co. v. Tarbet*, 98 U.S. 463, 25 L. Ed. 253 (1879); *Calhoun Gold Mining Co. v. Ajax Gold Mining Co.*, 182 U.S. 499, 45 L. Ed. 1200, 21 S. Ct. 885 (1901); *Jim Butler Tonopah Mining Co. v. West End Consol. Mining Co.*, 247 U.S. 450, 62 L. Ed. 1207, 38 S. Ct. 574 (1918); *Iron Silver Mining Co. v. Murphy*, 3 F. 368 (D. Nev. 1880); 1 C. Lindley, *Mines, A Treatise on the American Law Relating to Mines and Mineral Lands* § 309, at 685 (3d ed. 1914). Thus, Sunshine's analogy to a "blind apex" is of little value.

The reason for requiring a greater showing of specificity

as to the location of an apex than is present here is clear from the inherent limitation contained in the act:

> But their right of possession to such outside parts of such veins . . . shall be confined to such portions thereof as lie between vertical planes drawn downward . . . *through the end lines of their locations* . . .

(Italics ours.) The following diagrams of the surface area of a claim illustrate some possible locations of an apex in relation to end lines and the effect that such location has upon the extent of extralateral rights granted under the act:

1. In the ideal case the apex of a vein crosses both end lines of the claim entitling the locator to exercise his extralateral rights to the greatest extent allowable under the act. *See* 1 C. Lindley, *Mines, American Law Relating to Mines and Mineral Lands* § 309, at 684 (3d ed. 1914).

2. Where the apex of a vein crosses an end line of a claim and then passes out through a side line, the courts locate an imaginary end line at the point where the apex crosses the side line. *Del Monte Mining & Milling Co. v. Last Chance Mining & Milling Co.*, 171 U.S. 55, 43 L. Ed. 72, 18 S. Ct. 895 (1898); *Parrot Silver & Copper Co. v. Heinze*, 25 Mont. 139, 64 P. 326 (1901).

3. Where the apex of a vein crosses one end line and terminates at some point within the claim without crossing any other lines, an imaginary end line is drawn at the point where the vein terminates. (*See Republican Mining Co. v. Tyler Mining Co.*, 79 F. 733 (9th Cir.), *cert. denied*, 166 U.S. 720, 41 L. Ed. 1187, 17 S. Ct. 998 (1897)).

4. Where the apex of a vein crosses both side lines of a claim, the end lines become the side lines and the side lines become the end lines for purposes of extralateral rights. *See Flagstaff Silver Mining Co. v. Tarbet*, 98 U.S. 463, 25 L. Ed. 253 (1879); *King v. Amy & Silversmith Consol. Mining Co.*, 152 U.S. 222, 38 L. Ed. 419, 14 S. Ct. 510 (1894); *Northport Smelting & Refining Co. v. Lone Pine-Surprise Consol. Mines Co.*, 271 F. 105 (E. D. Wash. 1920), *aff'd*, 278 F. 719 (9th Cir. 1922).

It is apparent from these illustrations that the location of an apex in relation to the end lines of a claim determines the sweep of extralateral rights. Hence, the apex must be located with some precision.

Sunshine virtually admits that it cannot precisely locate the apex of the YGV in relation to the end lines of its claim or those claims under its control. The intriguing argument that wherever the apex is located on such properties, it will entitle Sunshine to extralateral rights to the YGV on the

Silver Surprize claims is illustrated as follows:

In effect, Sunshine is arguing for a "floating apex" concept.
 To adopt Sunshine's "floating apex" concept would require this court to ignore the express limitation contained in the act of 1872, *i.e.*, an extralateral rights claimant must prove the location of an apex of a vein in relation to the end lines of his claim before he will be permitted to follow that vein into another's property.[5] No authority is cited that would allow deviation from this long established statutory limitation and our research discloses none. Curtis H. Lindley, the foremost authority on mining law, describes the spirit in which courts should approach statutes on this subject by quoting Justice Brewer in *Del Monte Mining & Milling Co. v. Last Chance Mining & Milling Co.*, 171 U.S. 55, 66-67, 43 L. Ed. 72, 18 S. Ct. 895 (1898):

> And it must be borne in mind in considering the questions presented that we are dealing simply with statutory rights. There is no showing of any local customs or rules affecting the rights defined in and prescribed by the stat-

---

[5]Arguably, a 1945 preliminary draft of the 1946 agreement proposed by Sunshine would have eliminated its burden of establishing the exact location of the apex. The proposal was that Sunshine reserve "any existing rights it may have, in whole or in part, to any veins or ore bodies within the conveyed area which *apex north* thereof [Surprize Group] . . . " (Italics ours. Exhibit No. 298.) This provision was rejected by Silver Surprize.

ute, *and beyond the terms of the statute courts may not go. They have no power of legislation. They cannot assume the existence of any natural equity and rule that by reason of such equity a party may follow a vein into the territory of his neighbor, and appropriate it to his own use. If cases arise for which congress has made no provision, the courts cannot supply the defect. Congress having prescribed the conditions upon which extralateral rights may be acquired, a party must bring himself within those conditions or else be content with simply the mineral beneath the surface of his territory.* It is undoubtedly true that the primary thought of the statute is the disposal of the mines and minerals, and in the interpretation of the statute this primary purpose must be recognized and given effect. Hence, whenever a party has acquired the title to ground within whose surface area is the apex of a vein with a few or many feet along its course or strike, a right to follow that vein on its dip for the same length ought to be awarded to him if it can be done, and only if it can be done, under any fair and natural construction of the language of the statute. If the surface of the ground was everywhere level and veins constantly pursued a straight line there would be little difficulty in legislation to provide for all contingencies, but mineral is apt to be found in mountainous regions where great irregularity of surface exists and the course or strike of the veins is as irregular as the surface, so that many cases may arise in which statutory provisions will fail to secure to a discoverer of a vein such an amount thereof as equitably it would seem he ought to receive.

(Italics ours.) 2 C. Lindley, *Mines, American Law Relating to Mines and Mineral Lands* § 581, at 1295 (3d ed. 1914). Justice Brewer further said:

We make these observations because we find in some of the opinions assertions by the writers that they have devised rules which will work out equitable solutions of all difficulties. Perhaps those rules may have all the virtues which are claimed for them, and if so it were well if Congress could be persuaded to enact them into statute; but be that as it may, the question in the courts is not, what is equity, but what saith the statute.

This approach to the act was recognized in *Quilp Gold*

*Mining Co. v. Republic Mines Corp.*, 96 Wash. 439, 450-51, 165 P. 57 (1917):

[W]e must keep in view that we are dealing with contractual rights of the parties, and also that the parties, in contracting with reference to the matter, had in view their statutory rights as provided by the mining statutes of the United States. Congress prescribed the conditions upon which extra-lateral rights might be acquired; and a party dealing with mining locations necessarily must bring himself within those conditions or else be content with simply the mineral beneath the surface of his own territory.

The "floating apex" concept was not contemplated by the act of 1872. That act was written for the day when locators of claims ordinarily discovered the apex of veins at the surface of the ground. To encourage the discovery of minerals, the locator was granted the right to pursue that vein on dip outside the sidelines of his claim but within the extension of the end lines of his claim. The instant case is evidence of the fact that times have changed. Here, Sunshine has a network of tunnels radiating from its Jewell Shaft intersecting veins many thousands of feet underground. One of these tunnels intersected the ˋYGV at a depth of about 3,100 feet. Under these circumstances, a substantial burden is placed upon an extralateral claimant to overcome the presumption that an owner of a claim owns all of the ore within the boundaries of his claim. Mining up-dip to establish an apex at or near surface is often not economically justifiable. To avoid this burden, parties frequently enter into exploration agreements, as the parties attempted to do in this case. This practice may account for the lack of recent case authority on apex law.

Modern mining practice seems to require amendment of the act of 1872 to deal specifically with the problems that arise from deep underground discoveries. However, this court may not so legislate. Under existing law, the trial court, based on substantial evidence, properly concluded that because Sunshine did not prove the location of an apex to the YGV in relation to the end lines of any of its claims,

it failed to prove its right to remove ore from beneath the Surprize group of claims by virtue of its extralateral rights to the YGV.

II. Is THE YGV EXCLUDED FROM THE 1946 AGREEMENT?

Silver Surprize assigns error to the trial court's findings which in effect determine that the parties to the 1946 agreement did not intend to create a cotenancy relationship as to the YGV. Findings of fact Nos. 38, 39, 40, 41, 42. These findings were based upon parol evidence of the circumstances surrounding the execution of the 1946 agreement and a recital contained therein:

> Sunshine has heretofore driven an exploratory crosscut on its 3100 level in a southerly direction, a distance of approximately 2400 feet to a point within a few feet of the south line of the "Hilda" Claim of the Sunshine Consolidated. Said crosscut intersected a south dipping vein system at a point identified by the intersection of Co-ordinates Latitude S. 81243 Departure East. 78355, Sunshine Survey. From this point drifts were driven easterly and westerly along the course or strike of said vein system for several hundred feet. These drifts are a short distance north of the south side line of said "Hilda" Claim.

In other words, Sunshine was exploring the claim immediately north of the Surprize group of claims. The court reasoned that, while this recital did not identify the YGV by name, both parties were aware of its identity and significance; Surprize knew Sunshine claimed extralateral rights to the YGV and that the vein would penetrate the Surprize group; and therefore, the parties never intended the YGV to be covered under their agreement. Specifically, the court found:

> Surprize didn't then agree to that claim of right, but nevertheless was aware of it, and knew that in entering into the agreement, Sunshine did not intend to admit or concede a co-tenancy relationship or responsibility in respect to that vein, but rather to fully reserve its right to its claim of independent ownership. This created an unusual situation for although Sunshine's extralateral right was excluded from the agreement, the exercise of that right

involved the taking of ore which might come within the terms of the agreement and co-tenancy created thereby, if at some later time Sunshine could not prove its extralateral right. This conflict must have been apparent to both contracting parties at the time of the signing of the agreement but nothing was done to resolve it.

Finding of fact No. 38. Silver Surprize contends that this reasoning is erroneous because (1) the YGV was not expressly excluded from the 1946 agreement, and (2) the agreement is not ambiguous. Therefore, consideration of parol evidence to import an unexpressed intention to exclude the YGV violates the parol evidence rule. We agree.

The 1946 agreement is clear and unambiguous. Sunshine agreed to undertake exploration of the Silver Surprize claims and

> if commercial ore, *belonging to the Surprize group*, is discovered, Sunshine may reimburse itself for the expense of work financed by Sunshine out of the net proceeds of such ore, after which Sunshine and Surprize shall share equally in the gross receipts from such ore
> . . .

(Italics ours.) When Sunshine conveyed the three small claims to Silver Surprize, it reserved

> any extralateral rights within the exterior boundaries of said claims which *Sunshine* may have *owned* in whole or in part prior to the location of said claims.

(Italics ours.) Thus, only those veins in which Sunshine owned extralateral rights are reserved; if it did not own such rights, the vein would be covered by the agreement.

From the recital, it is evident that the parties recognized that ore might be discovered in the Surprize group based upon explorations occurring immediately to the north. If such a discovery was made and Sunshine owned extralateral rights to the vein, then it would be excluded from the agreement by the provision reserving such rights to Sunshine. However, if such extralateral rights are not proved, as the trial court properly found, the agreement required Sunshine to account for the ore removed from the Surprize group.

 Sunshine argues that the circumstances surrounding execution of the 1946 agreement support the trial court's conclusion that the parties intended to exclude the YGV. Although surrounding circumstances may be used to construe an agreement even though it is not ambiguous, such circumstances cannot be used to vary the terms of an agreement. This limitation was outlined in *J.W. Seavey Hop Corp. v. Pollock*, 20 Wn.2d 337, 348-49, 147 P.2d 310 (1944), where the court said:

> [W]e are mindful of the general rule that parol evidence is not admissible for the purpose of adding to, modifying, or contradicting the terms of a written contract, in the absence of fraud, accident, or mistake. But . . . parol evidence is admissible to show the situation of the parties and the circumstances under which a written instrument was executed, for the purpose of ascertaining the intention of the parties and properly construing the writing. Such evidence, however, is admitted, *not for the purpose of importing into a writing an intention not expressed therein*, but with the view of elucidating the meaning of the words employed. *Evidence of this character is admitted for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument.* It is the duty of the court to declare the meaning of what is written, and not what was intended to be written. If the evidence goes no further than to show the situation of the parties and the circumstances under which the instrument was executed, then it is admissible.

(Italics ours.) *See also Grant County Constructors v. E. V. Lane Corp.*, 77 Wn.2d 110, 120-22, 459 P.2d 947 (1969). The trial court considered (1) the publicity surrounding the discovery of the YGV at the location described in the recitals of the agreement; (2) the fact that it was well known that Sunshine claimed ownership of that vein; and (3) that the vein would probably penetrate the Surprize claim. Based on these circumstances, the trial court determined that the parties intended to exclude the YGV from the agreement. In doing so, we believe the court erred by "importing into the writing an intention not expressed therein." Since Sunshine failed to prove its extralateral right,

the ore removed from the YGV within the Surprize group was subject to the terms of the 1946 agreement.

This agreement created a cotenancy relationship between Sunshine and Silver Surprize when it provided:

> *Surprize* agrees upon the execution of the conveyance referred to in the preceding paragraph [three small claims] *to convey to Sunshine an undivided fifty per cent (50%) interest in and to the Surprise* [*sic*] *Group*, with unlimited right of ingress and egress, both on the surface and underground, together with a fifty per cent (50%) undivided interest in and to any and all veins, lodes, ledges or ore bodies which Surprize may own or be entitled to possess by virtue of extralateral rights flowing from the ownership of the Surprise [*sic*] Group.

(Italics ours.) The deeds referred to were exchanged bringing into existence the cotenancy. RCW 64.28.020; *see Uphoff v. Trustees of Tufts College*, 351 Ill. 146, 184 N.E. 213, 216, 93 A.L.R. 1224 (1932); 4 *American Law of Mining* § 22.3, at 135 (1974); 1A *Thompson on Real Property* § 177, at 125 (1964). This is an accounting action between cotenants in which Sunshine has raised the defenses of statutes of limitations and laches. Before these defenses can operate to bar the action, there must be an ouster of Silver Surprize from the cotenancy. *McKnight v. Basilides*, 19 Wn.2d 391, 400, 143 P.2d 307 (1943).

### III. Did Sunshine Acquire Title to the Ore Removed From the YGV by Ouster of its Cotenant, Silver Surprize?

That one cotenant may, by ouster, acquire the rights of his cotenant through adverse possession is well recognized. Annot., 82 A.L.R.2d *Adverse Possession—Cotenants* 23-24 (1962). The authors of this annotation, in summary, state:

> A cotenant . . . may undoubtedly hold the common premises adversely to his cotenant . . . and in such fashion as eventually to ripen his claim into title against them, even though his possession was commenced amicably as a cotenant. To establish that his possession was adverse he must show that at the time in question he was . . . in actual possession of the premises . . . to

which he makes claim, that he intended an actual adverse possession operative as of that time, that he did in fact hold and claim the premises adversely, and, lastly, that his cotenant . . . *had knowledge or notice of that fact.* In short, there are but three elements to be established: (1) the intent; (2) the adverse possession in fact; and (3) the knowledge or notice.

. . .

. . . in order for one cotenant to render his possession adverse to the others *there must be on his part some act or acts of exclusive ownership . . . making manifest the fact of a hostile holding and carrying knowledge or notice of it to the ones out of possession.* The nature of the acts said to be essential is variously characterized by expressions employing in each instance some or most of the following words: outward, open, overt, public, notorious, hostile, clear, positive, unequivocal, and unmistakable.

(Some italics ours. Footnotes omitted.) Annot., 35 A.L.R.2d *Minerals—Adverse Possession* § 24, at 175 (1954); *McCoy v. Lowrie,* 42 Wn.2d 24, 253 P.2d 415 (1953). The writers on adverse possession in 3 Am. Jur. 2d, § 174, at 263, caution that:

Evidence of adverse possession by a cotenant must be stronger than that which would be required to establish a title by adverse possession in a stranger. Thus *proof of ouster of a cotenant by another must be stronger than in the case of strangers. . . . An adverse claim by a cotenant against his fellow tenants cannot be established by inference.*

(Italics ours.) and in section 175, at pages 263-66:

before the possession of a cotenant can become adverse to his *cotenants* the latter *must have "knowledge"* or *"actual knowledge" that the possessor is* claiming exclusive ownership and is *holding the premises adversely to them.* . . . the prevailing rule appears to be that the *knowledge* required *may arise* from actual notice . . . or it may arise *from acts or circumstances* attending such adverse possession which are overt, notorious, and *unequivocal in their character* and import. From such acts it is the duty of the other cotenants to be informed thereof and to draw such reasonable inferences therefrom as pru-

dent persons possessed of, and interested in, like information would naturally do, and such cotenants out of possession cannot prevent the operation of the statute of limitations by proving that they did not know of the facts affecting their interest, or, knowing of them, did not draw correct conclusions therefrom. Thus it is held that notice may be constructive and will be presumed under proper circumstances. On the other hand, it is held that the knowledge of the hostile attitude of the possessor is not to be presumed, but must be shown by such proof as will preclude all doubt of knowledge on the part of the owner. In any event, *notice of the adverse possession must be clearly brought home to the possessor's cotenants*, actually or constructively. There must, at the least, be notice, actual or constructive, that the possessor is holding the premises adversely to his cotenants.

Mere knowledge by cotenants out of possession of the obvious fact of possession by one cotenant cannot be converted into proof of knowledge that the one in possession was claiming adversely. *Vague assertions of public opinion that a cotenant in possession is claiming to be the owner do not establish notorious acts of such unequivocal character that notice to his cotenants must be presumed.*

(Italics ours. Footnotes omitted.) *See McKnight v. Basilides*, 19 Wn.2d 391, 394-99, 143 P.2d 307 (1943); *Fritch v. Fritch*, 53 Wn.2d 496, 335 P.2d 43 (1959); *Nicholas v. Cousins*, 1 Wn. App. 133, 137, 459 P.2d 970 (1969). We examine the facts of this case in light of these general principles.

Silver Surprize contends the court erred when it determined that Sunshine by adverse possession "ousted" Silver Surprize from its ownership rights as a cotenant and thereby acquired title to the ore it had removed. Basically, Silver Surprize argues that the evidence is of insufficient quality to support the trial court's determination that it had actual or inquiry notice that Sunshine was infringing upon its mineral rights by exercising an adverse claim to the minerals. We agree.

As previously noted, evidence of adverse possession by a cotenant must be stronger and more convincing than that which would be required to establish title by adverse pos-

session in a stranger. In *McKnight v. Basilides, supra* at page 399, the court, quoting from a prior case, said:

> "To show an ouster of one tenant in common by his cotenant requires stronger and more convincing evidence than is necessary to sustain an ordinary claim of adverse possession.

Our function in such a case is not simply to determine whether there is substantial evidence to support a finding of actual or inquiry notice, but whether the evidence meets the higher standard of being "clear", "unequivocal", "unmistakable", or "convincing." *See In re Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973), where the court pointed out:

> We are firmly committed to the rule that a trial court's findings of fact will not be disturbed on appeal if they are supported by "substantial evidence". *Sylvester v. Imhoff*, 81 Wn.2d 637, 503 P.2d 734 (1972). Nevertheless, evidence that may be sufficiently "substantial" to support an ultimate fact in issue based upon a "preponderance of the evidence" may not be sufficient to support an ultimate fact in issue, proof of which must be established by clear, cogent and convincing evidence. *See In re Estate of Reilly*, 78 Wn.2d 623, 640, 479 P.2d 1 (1970). Thus, the question to be resolved is not merely whether there is "substantial evidence" to support the trial court's ultimate determination of the factual issue but whether there is "substantial evidence" to support such findings in light of the "highly probable" test.

(Footnote omitted.) Although, findings of fact regarding ouster by adverse possession need not use the words "notorious" or "hostile", they must "state the existence of facts that constitute such use." *Butler v. Anderson*, 71 Wn.2d 60, 65, 426 P.2d 467 (1967). In other words, the facts constituting actual or inquiry notice must be stated in the findings.

The evidence on which the trial court based its ultimate finding or conclusion of actual or inquiry notice are contained in findings of fact supported by the evidence and summarized as follows:

1. Surprize knew that the YGV had been discovered on adjoining properties and that on dip the vein would penetrate its claim. Surprize further knew that Sunshine

claimed extralateral rights to that vein. Finding of fact No. 44.

2. Sunshine entered the Silver Surprize property on the 3,100-foot level in 1950 after commercial ore deposits were found on adjoining claims at the 3,100- through 3,700-foot levels. The developments in adjoining Sun-Con and Metropolitan claims were widely publicized in local newspapers. Findings of fact Nos. 46, 54; exhibit No. 33.

3. From 1950 until 1960, Sunshine developed the YGV within the Silver Surprize boundaries on the 3,100-, 3,400-, and 3,700-foot levels and extracted rich silver ore. Finding of fact No. 47.

4. In February 1953, the secretary and a director of Silver Surprize wrote a letter to a former secretary and attorney that a Mr. Matthews had called and informed him he had hired a Mr. Sparling to look at some claims near the Surprize group and that Sparling told Matthews that the YGV could be partly within the Surprize group and that he felt mineral was being removed from underground workings and this fact was being kept silent. Mr. Matthews urged an investigation. This letter was forwarded to Mr. Vance McCarty, in Seattle, who was president of Silver Surprize. Finding of fact No. 47. There was no investigation. Finding of fact No. 53.

5. The maps accompanying Sunshine's annual report to its stockholders beginning in 1950 and through 1960 showed an entry into the Surprize group. Copies of these maps were made available to mine visitors and other copies were sent to stock exchanges in New York and Spokane, and to other interested people. Finding of fact No. 48.

6. In 1956, H. J. Hull, Sunshine's attorney in Wallace, wrote a letter to Sunshine's president, stating that he encountered A. V. McCarty, a director of Surprize, on the street in Wallace and that McCarty informed him "Sunshine had been beating him out of his ore and that he was going after him . . . Well, maybe they think it is theirs but it isn't, and I am going after them. I am 87 years old but I can still fight them. . . . We are turning it over to a big

outfit and they will go after Sunshine." Finding of fact No. 49.

7. From 1946 until the inception of this action in 1965, the officers of Silver Surprize were highly suspicious that Sunshine might have made exploratory entries into the Surprize group at levels unknown to them. They admitted to having extreme distrust for the president and executive vice-president of Sunshine. The question was never squarely put to any officials of Sunshine as to whether or not Sunshine had crossed into Surprize property or was doing any work there, nor did Silver Surprize ever request Sunshine to explore the YGV system within the Surprize property. Further, Silver Surprize never had an engineer inspect the underground workings of Sunshine to determine what it was doing in the area of the Surprize group. Findings of fact Nos. 50, 54.

8. From 1946 until the inception of this action, the corporate minutes of Silver Surprize do not include a single reference to the YGV, nor did the directors of Surprize ever write their stockholders regarding the possibilities of developing the YGV in Surprize property. During 1964, Vance McCarty, president of Surprize, received information from his stockbroker that Sunshine was operating within Surprize boundaries and saw a map from the University of Idaho School of Mines confirming it. No effort was made at that time to determine the truth of this fact. Finding of fact No. 51. McCarty explained that at that time he was attempting to get Sunshine to do some exploratory work that would give Silver Surprize some publicity to assist a proposed public offering. This exploratory work did not involve the YGV.

In the court's 50-page memorandum opinion, the foregoing facts were expressly stated to be the basis for its ultimate finding of actual or inquiry notice.[6] Findings of

---

[6] The memorandum opinion states:

"The evidence is clear that there was some communication be it in the form of direct statements or merely rumor to those concerned with Surprize, that Sunshine allegedly was infringing upon Surprize's mineral rights. The evidence with respect to that is as follows.

fact Nos. 57, 59. In effect, the court held that Surprize effectively conceded Sunshine's extralateral right to the YGV. Finding of fact No. 53.

The question before this court is whether the acts contained in the findings of fact are of the higher quality required to convey notice or knowledge of Sunshine's adverse possession sufficient to constitute ouster of its cotenant, Silver Surprize, as a matter of law. We think not.

It is evident from these findings that: (1) Sunshine never gave actual notice to Silver Surprize that it entered and extracted ore from the YGV within the Surprize group under its claimed reservation of extralateral rights; (2) While there was considerable publicity of ore discoveries on the YGV in adjoining claims, there was no publicity of Sunshine's entry, development, and removal of ore from the YGV in the Surprize group; (3) While the officers of Silver Surprize were suspicious that Sunshine might be removing ore as evidenced by the hearsay statement of Mr. Sparling and the remark of Mr. McCarty,[7] the findings do not reveal that those suspicions were based upon any open, notorious and unequivocal act of Sunshine occurring in the Surprize group; and (4) The maps attached to Sunshine's annual report do not indicate the removal of valuable ore within the Surprize group or any act of Sunshine inconsistent with the cotenancy relationship between the parties. Notice or knowledge of Sunshine's adverse possession may not be imputed to Silver Surprize based upon suspicion or hearsay opinion that does not have its source in open, notorious,

---

" . . .

"The foregoing evidence [summarized in paragraphs 1 through 8 above] leads me to believe that Surprize had actual knowledge of Sunshine's entry into and working within the Surprize boundaries, or such knowledge as would lead it to believe or investigate into that fact many years prior to 1959, and thus the statute of limitations was not tolled and has run on Surprize's cause of action."

[7] We assume arguendo that the letter from Mr. Hull to Sunshine's president, containing the remark, was properly admitted over objection of Silver Surprize. It should be noted, however, that Mr. Hull had no recollection of the conversation with Mr. McCarty and the sole evidence of the conversation is the letter.

unequivocal, and unmistakable adverse acts. *See Fritch v. Fritch, supra; McKnight v. Basilides, supra.*

In summary, neither the memorandum opinion nor the findings contain acts of such an open, notorious, and unequivocal character that would have conveyed actual notice or that would have put Surprize upon inquiry notice of Sunshine's adverse activity sufficient to constitute ouster.

Sunshine contends that the maps in Sunshine's offices were sufficient to put Surprize upon notice of Sunshine's entry into Surprize property. However, the trial court, specifically outlining in its memorandum opinion the evidence upon which it based its ultimate finding of actual or inquiry notice, failed to include any reference to such maps. (See footnote 6.) Neither did the court refer to John Edgar's conversations with A. V. McCarty, deceased at the time of trial, regarding the maps in reaching its ultimate finding. This is understandable since the maps were not in evidence and the testimony of Mr. Edgar is vague as to dates and nonspecific as to content. Instead, the court simply found that:

> Neither Vance nor Gerald McCarty ever mentioned the Yankee Girl Vein to Sunshine officials, including John Edgar . . . nor did they . . . ever squarely put the question to any officials of Sunshine Mine as to whether or not Sunshine had crossed into Surprize property or was doing any work there.

Finding of fact No. 50. If Edgar's statements to the McCartys or the maps in his office conveyed actual notice of entry into Surprize property, as the dissent contends, then why did not the court so find? Instead, the court simply found that Surprize failed to ask whether entry had in fact taken place. This finding contradicts Sunshine's contention that the trial court based its finding of actual notice of entry upon the maps. Therefore, aside from the fact that this evidence is not mentioned in the findings or memorandum opinion, it is apparent the trial court did not rely upon it to support its ultimate finding of notice.

Nevertheless, Sunshine contends that Silver Sur-

prize should have made inquiry as to whether Sunshine had entered and was developing the YGV within the Surprize group and, if not, should have urged Sunshine to do so. It is argued the court's finding that the vein referred to in the recitals of the 1946 agreement would penetrate the Surprize group imposed upon Silver Surprize the duty of specific inquiry concerning the YGV.[8] We disagree. Sunshine has the burden of proving ouster by adverse possession. To require Silver Surprize to explain its failure to inquire, absent prior proof by Sunshine of open, notorious, and unequivocal acts of adverse possession within the Surprize group giving rise to inquiry notice, would relieve Sunshine of its burden and shift the burden to Silver Surprize. Consequently, we hold that Sunshine has failed to sustain its higher burden of proving ouster by adverse possession as a matter of law.

IV. IS THE SILVER SURPRIZE ACTION BARRED BY LACHES AND STATUTES OF LIMITATION?

Sunshine contends the trial court properly found that the reason for a general lack of evidence on the issue of ouster is due to the passage of time and the death of many of the original participants. The trial court found this delay to be the result of Silver Surprize's failure to commence this action earlier and, therefore, concluded that laches operates as a bar to the present action.[9] We cannot agree.

---

[8]In fact, the minutes of Silver Surprize after 1953 reflect annual inquiries of Sunshine as to its general plans for development within the Surprize group under the 1946 agreement. The minutes show that Sunshine's responses were negative. Exhibit No. 248. Two separate letter inquiries by stockholders of Silver Surprize in 1956 and 1960 regarding activity under the 1946 agreement evoked a response by Sunshine that no commercial grade ore had been discovered within the Surprize group and there were no immediate plans for development. Exhibit Nos. 180, 181.

[9]*Teeter v. Brown*, 130 Wash. 506, 228 P. 291 (1924), relied upon by Sunshine to support this conclusion, is distinguishable. In that case, the activity of the adverse claimant would have been evident upon the slightest investigation because it was apparent that it was the only mine in the area. Here, it is not apparent that mining operations were occurring in the Surprize group. All of Sunshine's activity in the Surprize group occurred at a depth between 2,700 to 3,700 feet. The

At all times, the burden rested upon Sunshine to establish its right to the ore removed from the YGV within the Surprize group under its reservation of extralateral rights. When Sunshine entered the Surprize group in 1950, it knew that the apex of the YGV had not been located. Even though it believed that the apex of the YGV was within claims owned by it or under contract to it, Sunshine must be charged with knowledge that its extralateral rights were questionable.[10] At that point, Sunshine must also be charged with notice that if it could not establish extralateral rights to the YGV, then its removal of ore was covered by the 1946 agreement and required an accounting to Silver Surprize for the ore removed.

 If Sunshine intended to remove the ore under a theory of ouster by adverse possession, it had the burden of establishing that adversity by some open, notorious, unequivocal, unmistakable act that by its nature would survive the life of any of its participants. There is no finding

only access to the activity was through the Jewell Shaft located on the Sunshine claim from which numerous tunnels at varying depths radiate over great distances to numerous claims, one of which is the Surprize group. Thus, Sunshine's activity in the Surprize group was not readily apparent as contrasted to the single mining operation in *Teeter v. Brown, supra.*

[10]This fact was recognized in its 1954 agreement with Sunshine Consolidated:

> Disagreement between the parties has heretofore arisen in relation to the westerly limit of extralateral rights derived from the claims owned by Sunshine and the easterly limit of extralateral rights derived from claims owned by Sun Con. It will be difficult, expensive and time consuming to attempt to resolve the disagreement by a physical determination of the controlling facts and the parties mutually desire to compromise the disagreement and fix and determine their respective past and future rights in ore occurrences in said Yankee Girl Vein zone south of the south side line of said Hilda Claim.

Exhibit No. 3.

A review of the newspaper publicity, exhibit No. 331, contains no reference to this agreement.

It should be observed that as late as 1956 Sunshine believed that the apex was within the Sunshine Consolidated claim (exhibit No. 325); whereas, in this action Sunshine attempted to establish the apex at the Yankee Girl tunnel located upon its claim.

that such act ever occurred. Instead, Sunshine attempts to shift its burden of proof on the theory that Silver Surprize should have brought its action sooner and if it had, Sunshine could have produced the evidence of unequivocal acts proving ouster. While this line of reasoning is not without appeal, the fact remains that Sunshine has not sustained its burden of proving the unequivocal acts giving rise to notice of its adverse activity or the date on which such notice could be imputed to Silver Surprize. Since Sunshine has failed in this burden, there is no date after which Silver Surprize must be held to have brought its action and no date to commence the running of laches. Ouster is a prerequisite to the existence of laches. *Fritch v. Fritch*, 53 Wn.2d 496, 505-06, 335 P.2d 43 (1959). Similarly, in the absence of an ouster, the statutes of limitation do not operate to bar the present action. *McKnight v. Basilides*, 19 Wn.2d 391, 143 P.2d 307 (1943). We find the trial court erred when it found to the contrary.

## CONCLUSION

In our disposition of the issues raised, we are mindful of the strong burden placed upon a cotenant to prove ouster of his fellow cotenant due to the nature of the relationship between them. The nature of this relationship is summarized by the writers in 3 Am. Jur. 2d § 173, 257-59, based upon extensive case authority:

The general principle is that there is a relation of trust between tenants in common, each having an equal right of entry and possession. Thus every cotenant has the right to enter into and occupy the common property and every part thereof, provided in so doing he does not exclude his fellow tenants or otherwise deny to them some right to which they are entitled as cotenants; and they, on their part, may safely assume, until something occurs of which they must take notice, and which indicates the contrary, that the possession taken and held by him is held as a cotenant and is, in law, the possession of all the cotenants, and not adverse as to any of them. This proposition is based upon the supposition that the entry is made either eo nomine as tenant in common, or that it is silently made, without any particular avowal in regard

to it, or without notice to a cotenant that it is adverse. In the absence of facts showing that a cotenant in sole possession holds such possession in opposition to the rights of his cotenants, his occupancy will be presumed to be that of a tenant in common, the cotenancy being recognized. In case of tenants in common, the presumption is that the possession is not adverse to, but in common with, the other cotenants. Possession originating in cotenancy is presumably permissive, not hostile. Indeed, the presumption is strongly against every claim by a cotenant by which he seeks to convert the circumstance of an apparently individual possession into an advantage over his associates. The presumption that a cotenant in possession does not hold adversely to his cotenants but in common with them is strong, and cogent proof is required to overcome it. It continues until a possession legally adverse to the possessor's cotenants is established. To terminate the presumption there must be some hostile act, conduct, or declaration on the part of the possessor amounting to a repudiation of his cotenants' rights and an assertion of exclusive title in himself, of which the cotenants have knowledge or notice.

Further, it is generally stated that "[a]ll doubts as to the character of the possession are to be resolved against the claim of ouster or adverse possession." Annot., 82 A.L.R.2d *Adverse Possession—Cotenants* § 75, at 294 (1962). With the foregoing principles in mind, we have accepted the evidence relied upon by the trial court in making its findings, but are constrained to hold that this evidence is of insufficient quality to carry the stronger burden of proving ouster of a cotenant. *In re Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). Therefore, the trial court's ultimate finding of notice or inquiry notice must fail and with it the conclusion of ouster.

In view of our holding, the judgment of the trial court must be reversed. Silver Surprize contends that in the event of a reversal, the matter should not be remanded for completion of the accounting because Sunshine has rendered that accounting in answers to interrogatories. We disagree. During the trial, Sunshine pointed out to the court that an error had occurred in its answers to interrog-

atories and that in the event it held against Sunshine, it desired to reopen that issue and correct its accounting. It is our view that a proper exercise of discretion requires a remand for consideration of the accounting and a determination of the precise amount due Silver Surprize from Sunshine under the 1946 agreement.

Reversed and remanded.

MUNSON, J., concurs.

McINTURFF, C.J. (dissenting)—I respectfully disagree with the majority, not with its conclusion concerning the apex issue, but with its conclusion that "Sunshine has failed to sustain its burden of proving ouster by adverse possession *as a matter of law*." (Italics mine.) The crux of the majority's reasoning is that there was no substantial evidence of open, notorious, and unequivocal acts by Sunshine upon which the trial court could conclude that Surprize had actual knowledge of Sunshine's entry into Surprize's property or such knowledge or inquiry notice as would lead Surprize to investigate prior to 1959. I disagree.

It is clear that stronger proof is needed for a finding of adverse possession between cotenants than between strangers.[11] However, whether the actions and total circumstances are open, notorious, and hostile and a question of fact to be decided by the trier of fact is still applicable.[12] The decision is made within the context of the locality, nature, and character of the property, and the use made of it.[13] The court said, in *Hill v. L.W. Weidert Farms, Inc.*, 75 Wn.2d 871, 874, 454 P.2d 220 (1969):

> Whether or not respondents are entitled to the land by a claim of adverse possession is a question of fact, and as

[11]*McKnight v. Basilides*, 19 Wn.2d 391, 143 P.2d 307 (1943); *see also* Annot., 82 A.L.R.2d 5-306 for an extensive annotation on all aspects of adverse possession, especially section 90, at 305 which states: "The question of whether the possessor's cotenant had notice of the adverse character of his possession is ordinarily one for the jury or other trier of the facts."

[12]*Hunt v. Matthews*, 8 Wn. App. 233, 505 P.2d 819 (1973); *Northwest Cities Gas Co. v. Western Fuel Co.*, 13 Wn.2d 75, 123 P.2d 771 (1942).

[13]*Frolund v. Frankland*, 71 Wn.2d 812, 431 P.2d 188 (1967).

we have often stated, when the findings of the trial court are amply sustained by the record, as they are in the instant case, this court will not substitute its judgment for that of the trial court. [Citations omitted.]

Does the evidence support the trial court's finding of actual or inquiry notice? It is urged by the majority that the findings of fact and memorandum opinion of the trial court do not contain that quality of evidence necessary for ouster of a cotenant by adverse possession as a matter of law. I disagree, particularly when considering other proof not mentioned in the findings of fact or memorandum opinion which indicates by direct evidence actual notice that not only was Sunshine working the YGV, but was claiming adversely to Surprize. It is axiomatic that the trial court's decision, if correct, can be sustained on appeal on any ground within the pleadings and proof.[14] The trial court found that there was actual or inquiry notice based upon certain findings. Additional proof, not in the findings, lends further credence to the trial court's findings and ultimate conclusion of actual or inquiry notice.

The testimony of John Edgar, now of California working for the Bechtel Corporation, reveals that he commenced working for Sunshine in 1935 as an engineer, was promoted through chief engineer, mine superintendent, general superintendent of the Kellogg operations, general manager, vice-president, and eventually director. In 1946 he became mine superintendent, around 1950, general superintendent, and then general manager.

Mr. Edgar stated that Mr. A. V. McCarty visited them two to three times a week when Mr. McCarty was living on the Surprize claims. He often came in to see Mr. Leisk (superintendent of the mine), but when Mr. Leisk was not there, he talked to Mr. Edgar. If Mr. Edgar wasn't there, McCarty would stop in the engineering office and visit with

---

[14]*State v. Klinker*, 85 Wn.2d 509, 514, 537 P.2d 268 (1975); *Thompson v. Thompson*, 82 Wn.2d 352, 510 P.2d 827 (1973); *Northwest Collectors, Inc. v. Enders*, 74 Wn.2d 585, 595, 446 P.2d 200 (1968); *Lundgren v. Kieren*, 64 Wn.2d 672, 393 P.2d 625 (1964); *McDaniel v. McDaniel*, 14 Wn. App. 194, 198, 539 P.2d 699 (1975).

Jim Durnham, particularly, who was the chief engineer during the years that much of the work in question was being done. John Edgar was asked:

Do you have any particular recollections regarding any specific conversation about the fact that you were mining in the YGV within the Surprize property? *Answer*: Again not specific in the sense of a particular date but as superintendent I occupied the ground floor office on the southeast corner of the building of what was then the office building at the Sunshine Mine . . . That we always had a longitudinal section of the Sunshine Mine at the scale of 100 feet to the inch on the wall and any time that Mr. McCarty came to see me I reviewed by pointing out on the map on the wall what it was we were doing within the Silver Surprize. And his concern always was for an exploration program [other than YGV]. He showed little interest in what we were doing on the YGV. It was pointed out to him not only by me, but, . . . I assume by other departments as well.

This occurred prior to 1956.

From this testimony, it is clear that when Mr. McCarty came to the mine there was always a longitudinal map of the mine at a scale of 100 feet to the inch on the wall showing "what we were doing within . . . Surprize." His concern was for exploration programs or activity *other than* the YGV. Mr. Edgar went on to say "he showed little interest in what we were doing on the YGV. It was pointed out to him not only by me, . . ."

Additionally, in portions of Vance McCarty's deposition published in the record (at page 851),[15] McCarty stated in

---

[15]"Q As of 1957 you knew that they were mining in the 3400-level of the Metropolitan area?

"A Well, I knew that they were mining on this Yankee Girl vein but I didn't know what level but I had somehow or another been informed that they had been down to the 3700-level.

"Q This was about 1957?

"A Yes.

"Q And let's go back to say, I will take an arbitrary date, 1952, 1953, 1954, in that era of time, were you generally familiar that they were mining in that area?

"A In that area, yes.

"Q And you knew that the same vein intersected the Silver Sur-

essence that he knew the YGV intersected with the Silver Surprize property; that it was common knowledge; that Sunshine made them aware of the fact; and that Sunshine was working in the YGV.

Further evidence of Sunshine's claim of extralateral rights to the YGV is found in Vance McCarty's answers to questions by the court.[16] Mr. McCarty stated that his father

---

prize property at the easterly limits of the Silver Surprize property?

"A Yes.

" . . .

"Q And you knew that the Yankee Girl vein did intercept the Silver Surprize property?

"A yes.

"Q It was common knowledge?

"A Common knowledge by—I mean Sunshine made us aware of that. That it would.

"Q All right, now, it was common knowledge in any event?

"A Yes.

" . . .

"Q All right, you mentioned the common knowledge that was generally available in respect to the fact that Sunshine was working the Yankee Girl vein. The Yankee Girl vein is a well-known vein, is it not?

"A Right.

"Q Been a lot of discussion generally?

"A Well, generally there has been.

"Q In the area about it?

"A Newspaper talk on it.

"Q And it is a productive vein, is that correct?

"A Telling of their production and so forth. Yes.

"Q You knew it abutted your property?

"A Yes.

"Q Known that generally in the various degrees that you have previously described here from 1947 to 1950 on, haven't you?

" . . .

"A Yes."

[16]Statement of facts, page 959, line 4 through line 21 states:

"Q Were you ever in any of the negotiations with Sunshine or discussions with them as to the ownership of the Yankee Girl vein? You say that they contended that they owned it, the dip right, and you claimed it, and you people never conceded that. That you felt you owned the Yankee Girl or anything within the limits within your property. Were you ever in the discussions with them about that?

"A Not during the period when the negotiating was going on for the agreement.

"Q But I mean subsequently.

on many occasions told Mr. Leisk that "you can claim the extralateral rights to that ore but he said you prove it and if you can conclusively prove it it is your ore, you take it all."

Though the trial court in its memorandum opinion expressed disbelief of testimony by Vance McCarty as to certain points, and perhaps in general, this testimony constitutes an admission against the interests of Mr. McCarty, giving it greater credence.

There is substantial evidence that Surprize knew work was being done by Sunshine on the YGV within the Surprize claim; that Sunshine was claiming extralateral rights; and that Surprize was acquiescing in that contention.

Surprize contends that Sunshine was rightly within Surprize's claims as a cotenant; that this leads to a presumption that any ore taken therefrom would belong to both cotenants. This contention cannot stand when there is substantial evidence that Surprize had seen maps indicating the mining of YGV within Surprize, had been told that Sunshine was mining the YGV within Surprize property, and that no accounting was ever made under the 1946 agreement because of Sunshine's claimed extralateral rights.

The fact that this was taking place over 3,000 feet under ground does not make the acts of Sunshine any less notorious, open, or unequivocal when (1) McCarty was told by at least Mr. Edgar that Sunshine was mining the YGV within Surprize and additionally indicated on maps which showed this fact to be true; and (2) there was free access to the mine and never a refusal to Surprize personnel for an inspection. Possibly there would be no notice if the persons involved were unfamiliar with mining and its ways; but, A. V. McCarty and other officers of Surprize

---

"A I wasn't, but I was after that with my father and possibly a director or two, and this would come up and it would be discussed and argued in Mr. Leisk's office. My father on many occasions told Mr. Leisk that, he says, you claim the—you can claim the extralateral rights to that ore but he said you prove it and if you conclusively prove it it is your ore, you take it all."

were not novices in the mining business. Further, substantial evidence indicates that McCarty conceded the extralateral rights to YGV but was only interested in other explorations within the Surprize property.

Consequently, I would hold that there is substantial evidence of open, notorious, and unequivocal acts by Sunshine from which the trier of fact (the trial court in this instance) could properly conclude there was an ouster of Surprize by adverse possession. This substantial evidence, when considered in light of the voluminous additional findings of fact, makes it clear that the trial court had more than ample evidence for its determination of ouster by adverse possession of its cotenant, Surprize.

The doctrine of laches also appears to be applicable against Surprize. The elements of laches are:

(1) knowledge or reasonable opportunity to discover on the part of a potential plaintiff that he has a cause of action against a defendant; (2) an unreasonable delay by the plaintiff in commencing that cause of action; (3) damage to defendant resulting from the unreasonable delay.[17]

In considering these elements, (1) there is substantial evidence that A. V. McCarty had knowledge of Sunshine's work in the YGV within Surprize prior to 1956, in fact, he threatened to bring an action against defendants at that time; (2) action was not commenced until 1965; and (3) the statement of Judge Williams in his memorandum opinion states well the prejudice to the parties by delay:

In the present case it appears that the laches doctrine is applicable to the extent that there were sufficient facts present which amounted to notice or would be sufficient to put Surprize on inquiry to at least conduct independent research to determine whether its rights were being violated by the defendant. This Surprize apparently failed to do and if in fact it was commenced or any inquiry was made through its officials, evidence in support thereof is lacking. *The lack of this evidence is attributed primarily to the fact that the principal parties were involved in the mining scene during the years of alleged*

[17]*Buell v. Bremerton*, 80 Wn.2d 518, 522, 495 P.2d 1358 (1972).

*wrongdoing by defendant are now deceased.* It is thus impossible and improper for the court to speculate as to the quantum of knowledge possessed by A. V. McCarty of any fact of wrongdoing on Sunshine's part during the years of the alleged wrongdoing. It is equally speculative to determine what extent R. D. Leisk or others concerned with Sunshine fairly dealt with representatives of Surprize.

(Italics mine.) The action is stale and should not be condoned in equity.

In summary, this action involved a trial which had 14 witnesses, 349 exhibits, lasted 3 to 4 weeks and was very technical in nature. I cannot say that the trial court necessarily intended its listing of evidence giving rise to notice to be an exclusive listing, particularly in view of this deluge of testimony and exhibits. It would do an injustice to second guess the trier of fact and say that he did not also rely upon other testimony, including that cited in this dissent, but not detailed in the findings. The court in *In re Estate of Mikelson*, 41 Wn.2d 97, 247 P.2d 540 (1952), stated at pages 99-100: "[The trial court] is not required to include evidentiary facts in its findings, but need only find the ultimate facts on the material issues."[18] The ultimate fact at issue here is the existence of actual or inquiry notice of intent to hold adversely. The court found such notice to have existed. This finding was upon conflicting evidence and is entitled to great weight.[19]

---

[18]*Eickerman v. Eickerman*, 42 Wn.2d 165, 253 P.2d 962 (1953), states at page 169:

"To make the picture clearer, we have included in our statement of the case some of the findings the trial court declined to make. This does not imply that the court was under any duty to make them as specific findings. The trial court is not required to include every undisputed bit of testimony in its findings of fact (though undisputed, it may not be believed), nor is it required to include every conceded bit of testimony, which may or may not have bearing upon its decision. We have frequently and recently said that the trial court is not required to include evidentiary facts in its findings, but need only find the ultimate facts upon the material issues." *See also Wagner v. Wagner*, 1 Wn. App. 328, 330-31, 461 P.2d 577 (1969).

[19]*In re Estate of Mikelson, supra* at 99; see *In re Estate of Martinson*, 29 Wn.2d 912, 920, 190 P.2d 96 (1948); *In re Estate of Chapman*, 37 Wn.2d 682, 691, 225 P.2d 883 (1950).

In my opinion the quote of Justice Weaver in *In re Estate of Dand*, 41 Wn.2d 158, 247 P.2d 1016 (1952), at 163, is especially applicable:

This case is a striking example of the wisdom of our rule that the trial court, having the witnesses before it, is in a better position to arrive at the truth than is the appellate court. The respondents are entitled to the benefit of all evidence and reasonable inference therefrom in support of the findings of fact entered by the trial court. Two different theories were presented. The trial court rejected one and accepted the other. After an examination of the record, we cannot say that the evidence preponderates against the findings.

I would affirm the Superior Court.

Petitions for rehearing denied May 17, 1976.
Appealed to Supreme Court May 26, 1976.
Review granted by Supreme Court July 27, 1976.