[No. 34692.   Department Two.   January 29, 1959.]

ROSCOE O. FRITCH, *Respondent*, v. PHOEBE FRITCH, *Appellant.*[1]

[1]Reported in 335 P. (2d) 43.

*Colvin & Williams (John J. Keough,* of counsel), for appellant.

*King & King,* for respondent.

Donworth, J.— This action involves the ownership of a forty-acre tract of land near Kirkland, King county, pur-

chased by respondent (under an executory contract) while the parties hereto were husband and wife. Respondent, claiming sole and separate ownership, brought suit to quiet title in himself as against all claims of appellant, his divorced wife. Appellant, contending the land to be community property not disposed of in a prior divorce proceeding, sought to be adjudged the owner of an undivided one-half interest in the property as a tenant in common. From an adverse judgment, she appeals.

Since the issues raised on this appeal by the assignments of error relate principally to factual matters, we must have in mind the salient facts, most of which are not in conflict.

Respondent, a carpenter by trade, had worked in Alaska for several seasons prior to 1943. In December, 1942, or January, 1943, he returned to his home in Seattle. At that time, appellant was residing in the family home which the parties had purchased almost twenty years earlier. Three of their four children had grown and left the family home; only a daughter remained.

On March 1, 1943, respondent contracted to buy the land presently in dispute. Of the $2,000 total purchase price, he paid $550 down and agreed to pay the balance in installments. (Since the contract under which he purchased the property is not in evidence, we are unable to ascertain its terms. However, the record reveals that a deed, running to respondent as sole grantee, was executed by the grantors March 1, 1943, and was apparently deposited by them in escrow pending receipt of the entire purchase price.) The land was then covered with second growth timber. Respondent entered into possession almost immediately and commenced clearing land for a home site. This was while appellant was still residing in the parties' Seattle home. After about two acres had been cleared, respondent purchased materials and constructed a 16′ x 24′ "shack" or "two-room house," as respondent called it.

In May, 1943, the parties sold their home in Seattle. They divided the down payment which they had received. Respondent desired to make his home on the land now in dispute, while appellant wished to remain in Seattle. The

parties were unable to reconcile their differences. Respondent moved into the home of his sister near the Kirkland property. Accompanied by her daughter, appellant moved into an apartment in the home occupied by her aging parents. About that time, the parties divided their household goods and other personal property.

Thereafter, the purchasers of the parties' Seattle home defaulted in paying their installments. This matter was settled through their attorney, who was able to obtain $2,-000 (the entire balance which remained to be paid on the Seattle home).

In January, 1944, the parties met in the office of an attorney for the purpose of receiving the funds which had come into his possession as a result of this settlement. The evidence as to what occurred at that meeting is sharply conflicting.

It is appellant's version that respondent had agreed earlier that she should have the entire $2,000, but that he then demanded one half of it; that respondent was abusive; that she agreed that respondent could have the Kirkland property "as long as he makes it his home"; that no property settlement or any written agreement whatever was made.

On the other hand, respondent testified that appellant had agreed earlier that respondent could have one half of the proceeds, but that she then demanded all; that the parties discussed a two-hundred-forty-acre tract of land in Benton county owned by the parties and valued by respondent at somewhere between $1,000 and $1,500; that respondent offered this land to appellant, but she refused it; that she wanted the Kirkland property, but he declined; that appellant then wanted $550 (the amount paid down on the Kirkland property), which he also refused; that appellant said, "if you feel that way about it, you can take it"; that a written agreement was prepared and signed by the parties, each of whom received a copy thereof; that the agreement "gave me what equity I had in that property over there" (referring to Kirkland); that it made no mention of the Benton county property; that appellant made no mention of di-

vorce; that the attorney advised him that the writing would not "be legal until the judge puts his signature on it."

An adult son of the parties, who had accompanied appellant to the conference, testified on behalf of respondent at the time of trial as follows:

"Q. Was any agreement reached in your presence as to the Kirkland property? Did your mother and father reach any agreement that you know of while you were there, in your presence, as to the Kirkland property? A. No. Mother said she did not want it, or wanted nothing to do with it. Then after the voice rose and they got to talking on other subjects and Dad said if they wouldn't agree that he got $1,000 out of the home on the hill [Seattle], that he would get his own attorney . . ."

As a result of this conference, respondent obtained a check for $1,000 and applied most of the proceeds therefrom to the Kirkland property.

On January 25, 1944, appellant verified the complaint instituting divorce proceedings against her husband. This complaint, which was filed in the King county superior court February 1, 1944, made no mention whatever as to whether the parties did, or did not, have community property at that time. Following personal service upon respondent and his subsequent default, an interlocutory order of divorce was entered March 6, 1944. A final decree was subsequently entered October 4, 1944.

Although respondent testified that a written instrument, purporting to transfer the parties' "equity" in the Kirkland property to him, subject to court approval, was executed at the meeting in January, 1944, no such writing was produced at the time of trial. Furthermore, neither the interlocutory order nor the final decree of divorce made any reference to the existence or nonexistence of community property, much less to its disposition.

Subsequent to respondent's purchase of the Kirkland property in March, 1943, and before the conference in January, 1944, above mentioned, respondent reduced the principal balance due on the contract to approximately $1,326. Between January 28 and April 22, 1944, respondent paid

that balance in full, and obtained a deed which he filed for record on April 25, 1944.

Following January, 1944, respondent continued to dwell on the Kirkland property, continually improving it. He cleared more land, fenced the whole tract temporarily, then permanently, installed a water pumping system, constructed a concrete retaining wall, garage and small barn, and remodeled and enlarged the two-room house which he had originally built on the property. These improvements were made during the ten-year period between 1944 and 1954. Respondent, who was a carpenter, performed practically all of this work himself, but purchased materials and paid about $1,000 for "bulldozer" work in clearing the land.

Respondent paid all taxes subsequent to the acquisition of the property in 1943. Appellant made no effort to inquire into the status of the taxes. Following January, 1944, appellant made infrequent visits to the property, accompanied by her daughter. For a period of nearly thirteen years, appellant did not mention to respondent that she claimed any interest in the property, nor did respondent advise her that he was holding it adversely to her interest, if any, but at all times treated the property as his own. Nor did appellant object to the improvements made by respondent or offer to pay any part of the cost thereof.

In January, 1956, respondent gave to a third party an option to purchase the property for $40,000. On February 9, 1956, appellant, through her attorney, first advised respondent that she claimed an interest in the property. About ten months later, this action was commenced.

At the time of trial, the value of the entire tract, as improved (according to respondent's expert witness), was $48,000. Of that sum, $15,700 was attributable to improvements ($9,700 for buildings and $6,000 for clearing land). When $15,700 is added to the total purchase price of $2,000, it becomes apparent that the principal value of the property is the land itself and that, because of its location and topographical characteristics, the land alone had multiplied in value over fifteen times since 1943, or an increase of $30,300 in land value.

502

In his complaint, respondent set out four causes of action. He alleged that: (1) The Kirkland property was acquired with his separate funds; (2) he held the property for the required time and under such conditions as to acquire title by adverse possession; (3) appellant's conduct estopped her from asserting title; (4) appellant's conduct constituted laches. In her answer, appellant generally denied these averments and affirmatively alleged that respondent's occupancy of the Kirkland property was with appellant's permission and consent, and that since the date of the final decree of divorce (October 4, 1944), the parties had been co-tenants of the property. Appellant prayed dismissal of respondent's complaint and that she be adjudged owner of an undivided one-half interest in the property. These affirmative averments were denied in respondent's reply, and the cause proceeded to trial on the issues thus framed.

At the conclusion of the evidence, the trial judge took the matter under advisement. He thereafter rendered a memorandum decision in which he concluded:

"Adverse possession, as against a tenant in common, must be clearly established. The court in this case feels that the proof is clear and convincing. The court's conclusions of law will be to the effect that both claims of adverse possession [under RCW 7.28.070 and 4.16.020] must be sustained, and that in all events . . . [appellant] is estopped to assert title."

Conclusions of law, in accordance with the court's memorandum decision, and findings of fact, supporting these conclusions, were subsequently entered. These findings and conclusions form the basis for nine of appellant's eleven assignments of error.

■ At the outset, it must be noted that a finding that the parties became tenants in common as to the disputed property (which was not disposed of in the final decree of divorce) is inherent in the trial court's judgment and conclusions supporting it. (And, properly so under our prior decisions. *Witzel v. Tena*, 48 Wn. (2d) 628, 295 P. (2d) 1115 (1956); *Lavigne v. Hughes*, 199 Wash. 285, 91 P. (2d) 560 (1939); *Hicks v. Hicks*, 69 Wash. 627, 125 Pac. 945 (1912); *Graves v.*

*Graves*, 48 Wash. 664, 94 Pac. 481 (1908)). Otherwise, appellant would have no interest in the property which respondent could, under any circumstances, acquire by adverse possession or which appellant could be estopped from asserting.

■ Turning to the court's findings and conclusions concerning adverse possession, we think that our disposition of this issue is controlled by our decision in *McKnight v. Basilides*, 19 Wn. (2d) 391, 143 P. (2d) 307 (1943). There, two homes were community property at the time the wife died intestate. Her estate was not probated. Her widower resided in one of the homes and rented the other for about thirteen years after her death, during which time he paid all taxes and assessments, made improvements and received the rent from the one home. The children of his deceased wife brought suit for partition of the property and an accounting. The widower had not, until shortly before the action was commenced, advised them that he claimed the property as sole owner. Nor had they made known to him any claim to the property during the thirteen-year period. In rejecting the widower's assertion that he had acquired title by adverse possession, we quoted extensively from American Jurisprudence, in part, as follows:

"Since acts of ownership which, in case of a stranger, would be deemed adverse and per se a disseisin, are, in cases of tenancies in common, susceptible of explanation consistently with the real title, they are not necessarily inconsistent with the unity of possession existing under a cotenancy. . . .

"Generally, a cotenant's sole possession of the land becomes adverse to his fellow tenants by his repudiation or disavowal of the relation of cotenancy between them, and any act or conduct signifying his intention to hold, occupy, and enjoy the premises exclusively, and of which the tenant out of possession has knowledge, or of which he has sufficient information to put him upon inquiry, amounts to an ouster of such tenant. . . . A writing is unnecessary, but the claimant must show a definite and continuous assertion of an adverse right by overt acts of unequivocal character clearly indicating an assertion of ownership of the premises

to the exclusion of the right of the other cotenants." 1 Am. Jur., Adverse Possession, 824, § 54.

Applying these principles to the present case, we find that respondent treated the property after the parties' divorce in precisely the same manner as he had before. He continued the improvements which he had started prior thereto and made subsequent additional improvements. Appellant visited the property on several occasions, viewed the improvements and acquiesced therein. They obviously benefited the property and would enure to her benefit as a cotenant. As in the *McKnight* case, respondent paid all taxes and assessments, and did not state to appellant, or otherwise indicate, that he claimed as sole owner. Nor did she assert any interest in the property for over twelve years.

Another case very similar on its facts to that now before us is *Graves v. Graves, supra,* wherein certain community real property was not disposed of in a divorce decree obtained by the husband in 1893. Thereafter, the husband collected rents and paid all taxes. In 1906, his former wife first asserted her claim as a tenant in common. Her position was sustained by this court to the exclusion of her former husband's claim that he had acquired title by adverse possession.

■ We hold that, as applied to the facts of this case, the *McKnight* and *Graves* decisions are controlling, and that the trial court's conclusions to the contrary cannot be upheld.

■ On the issue of estoppel, respondent asserts that our decision in *Witzel v. Tena, supra,* is squarely applicable. There, a wife commenced a divorce action in Washington in 1937, disclaiming in her complaint any interest in the community property thereafter in dispute. She later abandoned that action, and in 1939 commenced divorce proceedings in Nevada. She alleged in her complaint that there was no community property, and the Nevada court so found. Her husband appeared in the action and waived his right to defend, relying upon her express disclaimer of any interest in the property. At that time, the farm property

involved was subject to encumbrances exceeding its value. She remarried in 1939. In 1953, she brought suit to partition the property, which, at the time of trial in 1955, was valued at $53,000, and was free from debt. We held that on the undisputed facts she was estopped to assert her claim because each of the elements therein set out existed. We said:

" . . . The doctrine of equitable estoppel or estoppel *in pais* is applied where justice forbids that one speak the truth in his own behalf. . . . [Citation] For the doctrine to be applicable, there must be (1) acts, statements, or admissions inconsistent with a claim subsequently asserted, (2) action or change of position on the part of the other party in reliance upon such acts, statements, or admissions, and (3) a resulting injustice to such other party, if the first party is allowed to contradict or repudiate his former acts, statements, or admissions."

■ Concerning the first of these elements, respondent can only rely upon the oral statement made by appellant prior to the commencement of divorce proceedings that he could "take" the property. Appellant's failure to allege in her divorce complaint that any community property existed cannot be considered the equivalent of a positive averment that there was no community property as in the *Witzel* case, and, unlike that case, the divorce court made no finding thereon. After the final decree of divorce, both parties remained silent.

■ However, assuming, *arguendo*, that the first element of estoppel is satisfied, we think that the evidence fails to satisfy the second and third elements. Respondent's only change of position was in continuing to improve the property after the divorce, just as he had done before it. Furthermore, respondent can be injured unjustly only if he does not receive contribution from appellant for improvements, made subsequent to the final decree, which enhanced the value of the property and enured to the benefit of both parties as cotenants.

■ In view of its other conclusions, the trial court made no finding on the issue of *laches*, although it was presented in the pleadings. We hold that for the reasons stated with

respect to adverse possession, appellant is not estopped to assert her present claim because of laches. *Cf. McKnight v. Basilides, supra; Graves v. Graves, supra.*

■ The foregoing conclusions require reversal of the judgment with directions to enter a decree quieting title in appellant to an undivided one-half interest in the property. But we think that the evidence supports the court's finding that respondent expended $1,000 of his separate funds in discharging the purchase contract balance. Respondent has also paid all taxes and assessments since the divorce. He is, therefore, entitled to contribution from his cotenant (appellant) for one half of the amounts so paid. *Robinson v. Robinson,* 14 Wn. (2d) 98, 126 P. (2d) 1090 (1942); *Olson v. Chapman,* 4 Wn. (2d) 522, 104 P. (2d) 344 (1940); 14 Am. Jur., Cotenancy, 109, § 43. On the other hand, appellant has, by her testimony, waived any claim for rent during the time that respondent has maintained his home on the property. Hence, she is not entitled to any offset therefor.

The evidence also discloses that appellant has acquiesced in, and consented to, the improvements which respondent has made to the property subsequent to the entry of the final decree of divorce. These improvements resulted in large part from respondent's own labor performed subsequent to the divorce and from the labor of other persons who worked at his request, and from supplies and materials purchased and paid for by him. Neither the evidence, nor the trial court's finding thereon, establishes the total of these items with reasonable certainty.

We, therefore, reverse the judgment and direct that appellant be granted the relief sought, subject to a lien on her undivided half interest in the property in favor of respondent for $500, plus one half of the sums paid by him for taxes and assessments, plus one half of the value of the improvements placed on the property subsequent to the final decree of divorce. For the purpose of fixing the total amount of such lien, the trial court is authorized to take such further testimony as it deems necessary to determine with reasonable certainty the sum total of the various items referred to in this paragraph. The decree to be entered

shall impress a lien upon appellant's interest for one half of the total amount found by the court, and shall in all other respects be in accordance with the views expressed herein.

Appellant shall recover her taxable costs in this court.

WEAVER, C. J., HILL, ROSELLINI, and FOSTER, JJ., concur.

