

2013 NOV 25 AM 9: 41

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOYCE ZAMELIS, | ) | |
| | ) | No. 68841-3-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| ZINTARS ZAMELIS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: November 25, 2013 |

SPEARMAN, A.C.J. – Zintars Zamelis appeals from the trial court's findings

of fact, conclusions of law, and judgment entered in a partition action brought by

his former wife, Joyce Zamelis. He contends the trial court erred in ruling that real

property purchased during the couple's marriage should be sold and the

proceeds divided equally between them. We conclude the trial court acted within

its equitable discretion given the facts in this case and affirm.

## FACTS

Zintars Zamelis and Joyce Zamelis[1] were married in 1963. Zintars

controlled the couple's finances. On July 20, 1971, they purchased a home and

land (the Property) in Honeymoon Bay, Washington. The mortgage of $20,000

was owed to National Bank of Commerce (hereinafter Rainier National Bank).

---

[1] The parties will be referred to by their first names for convenience.

After they bought the Property, Zintars told Joyce that if they ever divorced, he would make sure she got nothing. Later that year, the parties granted a second mortgage on the Property in the amount of $40,000 to secure payment for the purchase of a business, Alert Glass. That mortgage was also owed to Rainier National Bank.

In 1976, Zintars told Joyce he owed money to Victor Otlans, his Latvian fraternity brother, and that they had to quit claim the Property to Otlans to satisfy the debt. The Zamelises executed a quitclaim deed. Zintars told her the house belonged to Otlans, but that at some point, Otlans would deed the Property back to them. The Zamelises continued to reside on the Property and to pay the mortgage, taxes, and insurance. As far as Joyce knew, they were paying rent to Otlans.

In 1979, a business creditor sued the Zamelises and Otlans for fraudulent transfer of the Property. The lawsuit was dismissed subject to the condition that it could be re-filed if the Property was ever repurchased by the Zamelises for less than fair consideration. In 1980, the Zamelises and Alert Glass filed for bankruptcy, though Joyce did not know the details. Several months later, the bankruptcy court entered a discharge of debtors. In 1983, Rainier National Bank filed a complaint against the Zamelises and Otlans for foreclosure of the second mortgage. Otlans executed a short form deed of trust in the sum of $18,000 to satisfy the bank's complaint.

In November 1983, Zintars and Joyce separated. Joyce moved out of the Property while Zintars stayed with their daughter. Joyce wanted to stay and for Zintars to leave, but Zintars told her that Otlans would not allow it. When Joyce left in 1983, the Property was in good but not excellent condition. In 1984, Joyce filed a petition for dissolution and a lis pendens against the Property.

By 1986, Zintars wanted to get divorced, but Joyce first wanted an agreement regarding the Property. Zintars knew she believed title to the Property was a sham transaction between him and Otlans. He thus drafted a "Partnership Agreement" that the parties signed in August 1986. The agreement purported to "dispense any past, present or future aspirations by either part[y] in regard to their posture on [the Property]" by establishing a "limited and equal partnership for the sole purpose of purchasing, renting, and selling" the Property. Exhibit (Ex.) 31. It stated that Zintars, the active partner, would solicit and arrange for financing of the Property; maintain the Property to make it rentable and expense that cost to the partnership at the rate of $15 per hour; keep the premises rented "but not at his peril"; and keep the mortgage current. The agreement stated that Joyce would be equally responsible for the mortgage and that Zintars and Joyce would each pay $150 per month to meet any shortages between the mortgage and rent and to pay for repairs. Furthermore, "[a]ll capital improvements, change of responsibility, and any amendments to this agreement shall be in writing, signed by both partners." Id. Zintars agreed to "divulge within 10 days and share equally any monies and real benefits that come to him now or in the future as a

3

result of the community property period of the marriage." Id. The agreement required Joyce to release her lis pendens on the Property, which she did.

On December 30, 1986, Otlans conveyed the Property to Zintars by quitclaim deed. Joyce was not named as a grantee. Consideration was "assumption of liability only." Ex. 8. Zintars put the deed in his safe deposit box. He had no conversations with Joyce in the following year and delivered no documents to her.

On March 14, 1988, the decree of dissolution was entered. The decree, prepared by Zintars, purported to give each party one-half of partnership real property and to give Joyce "$5,000 paid on the property/partnership." It stated that each party was liable for $11,000 owed to Otlans and for "partnership liability on real property." Joyce had not paid nor received $5,000 on the Property and she did not know what that asset referred to. Clerk's Papers (CP) at 10. She also did not know what the debt to Otlans was for; she saw no documents to evidence it and never heard from Otlans to collect it. After the divorce, Joyce called Otlans about the Property and felt reassured that when legal title was recovered, the Property would be in both parties' names.

Zintars continued to reside on the Property after the divorce, though he was injured and unable to work on the house. He paid the monthly mortgage of $144.57 to Rainier National Bank until January 31, 1997, when it was paid off. In 1993, he began dating Krisstine Muzzy. When Muzzy first saw the Property, it was a "dump." Report of Proceedings (RP) at 238. From 1994 on, Zintars and

4

Muzzy made updates and improvements to the Property, most significantly the conversion of the garage into an accessory living unit and the construction of a detached garage. They were married in 2000, and Muzzy's mother came to live with them in 2001. Muzzy and her mother invested substantial sums into the Property.

From 1988 to 2004, Joyce checked Island County real property records, which showed that the Property was in Otlans' name. During this time, she rented rooms and bought a trailer. In 2005, she moved to Oregon. On January 18, 2005, after Otlans passed away, Zintars recorded the 1986 quit claim deed. Joyce discovered the deed when she checked county records in the fall of 2008.

Joyce filed a complaint against Zintars on March 26, 2009 and an amended complaint on August 7, seeking to quiet title and partition the Property. Zintars filed an amended answer, asserting a counterclaim for adverse possession and claiming Joyce owed him $486,274.29, with interest, under the Partnership Agreement. In his amended answer and his answers to interrogatories, Zintars admitted that Otlans executed the quitclaim deed on December 30, 1986 and that he had an ownership interest in the Property as of January 1, 1987.

The trial court held a bench trial. Contrary to the admissions in his amended answer and answers to interrogatories, Zintars testified at trial that he did not receive the December 1986 quit claim deed until December 1991, when he purportedly paid off a $22,000 promissory note to Otlans. Zintars produced

two promissory notes—one for $22,000 and the other for $6,400—that he had executed in favor of Otlans on December 30, 1986. Zintars testified that the $22,000 note represented the $18,000 deed of trust from Otlans to Rainier National Bank. He testified that the second note was for repayment of a roof put on his business's property in 1976. The decree of dissolution did not identify either of the promissory notes as encumbering the Property. Zintars testified that he told Joyce in 1991 that he had paid off the note to Otlans and had the quit-claim deed to the Property, and that she owed him a certain amount of money.

The trial court entered findings of fact, conclusions of law, and a judgment on May 7, 2012. It found that Zintars' testimony was not credible. It found that Otlans signed the quitclaim deed on December 30, 1986 and that the timing of the promissory notes after the separation, the date of the quitclaim deed, Zintars' vow to make sure Joyce received nothing from the marriage and the friendship between Zintars and Otlans evidenced Zintars' efforts to cut Joyce out of the Property. The court found that Zintars provided no documentary proof that he had paid the sums due on the promissory notes to Otlans and found that the notes were not for financing the Property because they were not secured. It concluded that Zintars had repudiated the Partnership Agreement and set it aside.[2] The court ordered that the Property be sold and the proceeds divided equally. Zintars appeals.

---

[2] The trial court also concluded that Muzzy had recourse against Zintars for monies she put into the Property.

## DISCUSSION

This case involves a partition action, which "is both a right and a flexible equitable remedy subject to judicial discretion." Friend v. Friend, 92 Wn. App. 799, 803, 964 P.2d 1219 (1998) (citing Anderson & Mitchell Lumber Co. v. Quinault Indian Nation, 130 Wn2d 862, 873, 929 P.2d 379 (1996)). A trial court's order partitioning property is reviewed for abuse of discretion. Id. at 805. We review a trial court's findings of fact for substantial evidence and review de novo whether its conclusions of law flow from its findings. Dep't of Labor & Indus. v. Shirley, 171 Wn. App. 870, 288 P.3d 390, 394 (2012), rev. denied, 177 Wn.2d 1006, 300 P.3d 415 (2013)).

Initially, while Zintars assigns error to fourteen findings of fact and six conclusions of law, he makes no argument addressing why any of the findings of fact or two of the conclusions of law were erroneous.[3] This court will not review

---

[3] Zintars assigns error to the following findings of fact and conclusions of law:

Finding of Fact 54: [Joyce] did not know what that asset [the "$5,000 paid on property/partnership" listed in the decree of dissolution as awarded to Joyce] was.

Finding of Fact 56: [Zintars] did very little to maintain the property.

Finding of Fact 79: [Zintars] knew that if [Joyce] knew of the deed, she would sue to recover the property.

Finding of Fact 87: It is not credible that [Otlans] would wait 10 years [from 1976 to 1986], during which time the parties declared bankruptcy, to recover his debt.

Finding of Fact 88: The timing of the debt is suspicious. It was incurred only by [Zintars] during the parties' separation and without [Joyce's] knowledge.

Finding of Fact 90: If [Zintars] had told [Joyce] in 1991 that he had possession of the deed, this action would have commenced in 1991.

Finding of Fact 91: [Zintars] hid the quit claim deed in a safety deposit box.

Finding of Fact 92: The Court strongly suspects that [Zintars] had possession of the deed on December 30, 1986, Mr. Otlans signed the quitclaim deed on December 30, 1986, the same day that Zintar signed promissory notes.

Finding of Fact 94: The timing of the promissory notes after separation, the date of the quit claim deed and [Zintars'] vow to make sure [Joyce] received nothing from the marriage combined with the deep friendship between [Zintars] and [Otlans] convinced the Court that [Zintars] was trying to cut [Joyce] out of the subject property, which both parties acknowledge was a community asset.

Finding of Fact 95: [Zintars] did not provide any proof, other than his testimony, which was riddled with inconsistencies, that he actually paid [Otlans] the sums due on the notes.

Finding of Fact 96: Although [Zintars] was able to find other documents more than 20 years old, he offered not one canceled check, not one bank statement to show proof of payment.

Finding of Fact 99: [Zintars'] payments on the property were far below fair rental value.
Finding of Fact 100: [Zintars] now claims that he is owed $150 per month from [Joyce] since 1986.

Finding of Fact 103: If [Zintars] had notified [Joyce] in late 1986, when the court believes he got the quit claim deed, of his title to the real property, the property would have been sold or rented then.

Conclusion of Law 3: The notes that [Zintars] signed to [Otlans] in 1986 were not for financing the subject property because the notes were not secured.

Conclusion of Law 4: The liability against the subject property referenced in the 1986 deed was the note and deed of trust in favor of Rainier National Bank, which, in 1986, was $12,000.

Conclusion of Law 5: [Zintars] repudiated the 1986 partnership agreement.

Conclusion of Law 6: The partnership agreement should be set aside.

Conclusion of Law 11: It is equitable that the subject property be sold and the proceeds divided equally between the parties.

Conclusion of Law 13: In exchange for his exclusive occupancy of the residence, [Zintars] should pay the taxes and insurance and maintenance for the property and he should pay rent to [Joyce] in the sum of $1,000 per month, commencing April 1, 2012.

CP at 5-15.

No. 68841-3-I/9

assignments of error that are not supported by argument and citation to authority. Raum v. City of Bellevue, 171 Wn. App. 124, 149, 286 P.3d 695 (2012), rev. denied, 176 Wn.2d 1024, 301 P.3d 1047 (2013)). Therefore, we do not consider Zintars' challenges to any of the findings of fact or to conclusions of law 3 and 4.

On appeal, Zintars makes three main arguments as to why the trial court's order should be reversed.[4] First, he argues that the court abused its discretion in ordering that the proceeds from the sale of the Property be divided equally without deducting Joyce's share of the purchase price, taxes, and costs of improvements from 1983 on. He contends she was required to make these contributions under principles of tenancy in common, relying on Cummings v. Anderson, 94 Wn.2d 135, 614 P.2d 1283 (1980). We disagree.

In Cummings, a couple purchased a home on a real estate contract as tenants in common and married within a year. Id. at 136-37. Several months after they were married, the wife left the property, taking most of the couple's personal property, including the cash in their bank account. Id. at 137. She obtained a default dissolution decree. Years later, by which time most of the payments had been made under the original contract, she brought suit against her former

_____

[4] Although Zintars claimed in his amended complaint that Joyce owed him $486,274.29, with interest, under the Partnership Agreement, he does not, on appeal, continue to argue that he was due this amount. Instead, he argues that this court should remand with instructions to order the trial court to amend the judgment so that Joyce is awarded one-half of the value of the Property as of March 14, 1988 (the date of the decree of dissolution), deducting one-half of the balance owed to Rainier National Bank and $11,000 (as provided in the decree of dissolution) and crediting her with $5,000 paid toward the partnership liability (as stated in the decree). He contends the trial court should order the Property to be listed for sale, upon which Joyce should receive her proportionate share, after deducting her share of the costs of sale.

9

husband, seeking one-half of the equity value of the property and one-half of the fair rental value during the time he lived there alone. Id. at 137-38. The Washington Supreme Court explained that where parties own property as co-tenants, they are presumed to own the property equally unless they contributed unequally to the purchase price, in which case "a presumption arises that they intended to share the property proportionately to the purchase price." Id. at 140 (citing Iredell v. Iredell, 49 Wn.2d 627, 305 P.2d 805 (1957)). It explained that tenants in common owe fiduciary duties to each other and that the husband had not breached any fiduciary duties owed to the wife. Id. at 143. It concluded,

> Here, the trial court correctly held that the respondent, having abandoned her obligations under the contract, could no longer be heard to say that her interest was equal to that of the petitioner, who alone made the payments necessary to preserve the equity existing at that time and avoid forfeiture. There appears no reason why the petitioner should have intended to donate to the respondent the benefit of one-half of the payments which he made after their relationship terminated, nor is it contended that he had any legal or equitable duty to do so.

Id. The Court held that the wife was entitled only to the interest she had acquired in the property by the time she had left. Id. at 144.

This case presents a very different situation. In Cummings, the wife abandoned her obligations as a tenant in common and there was no deceit on the part of the husband. The parties did not discuss their rights in the property or their future obligations when the wife left the property. Id. at 137. The wife made no offer to make payments necessary for acquisition of the property nor did she assert a right to occupy the property or to receive rent for the husband's

10

occupancy. Id. Here, in contrast, after the parties separated they agreed that they owned the Property as partners and agreed to jointly purchase, rent, and sell the Property. But Zintars did not honor that agreement or his fiduciary duties to Joyce. Instead, several months after entering into the agreement, he obtained a quit claim deed giving him sole title to the Property. He then represented for over 17 years that the Property belonged to Otlans and that he was merely a tenant. Joyce did not abandon her obligation to make payments under the Partnership Agreement or decree of dissolution; that duty was not triggered because she did not learn until 2008 that title had been recovered from Otlans. The trial court acted within its discretion when it determined that Zintars should not receive credit for mortgage payments and taxes during the period he represented that he was a renter, particularly when he paid significantly less than fair rental value to live in the Property while Joyce rented rooms and lived in a trailer.[5]

As for Zintars' improvements to the Property, the trial court did not err in not ordering that the value of the improvements be deducted from Joyce's share of the proceeds from the sale of the Property. Generally,

> [w]hile a cotenant cannot at his own suit recover for improvements placed upon the common estate without the request or consent of his cotenant, yet a court of equity, in a partition suit, will give the cotenant the fruits of his industry and expenditures, by allotting to him the parcel so enhanced in value or so much thereof as represents his share of the whole tract.

---

[5] During those years, Zintars paid $144 per month in mortgage payments and less than $200 per month in taxes, when the houses Joyce sought to rent were being rented at $700 per month. The mortgage was paid off in 1997, and thereafter Zintars paid little in real estate taxes (in 2010 he paid $788, approximately $65 per month).

Cummings, 94 Wn.2d at 141. But here, we agree with Joyce that it was equitable for the increase in the Property's value from the improvements to be offset by rent due upon Zintars' ouster of Joyce in January 2005. A cotenant ousts another cotenant by repudiating or disavowing cotenancy and engaging in acts or conduct signifying his intention to hold, occupy, and enjoy the premises exclusively, acts of which the tenant out of possession has knowledge or sufficient information to be put on inquiry. Fritch v. Fritch, 53 Wn.2d 496, 503, 335 P.2d 43 (1959). The claimant "'must show a definite and continuous assertion of an adverse right by overt acts of unequivocal character clearly indicating an assertion of ownership of the premises to the exclusion of the right of the other cotenants.'" Id. at 503-04 (quoting 1 AM. JUR., ADVERSE POSSESSION, 824 § 54). When an occupying cotenant ousts a non-occupying cotenant, the former begins to owe rent. Yakavonis v. Tilton, 93 Wn. App. 304, 309, 968 P.2d 908 (1998).

On January 18, 2005, Zintars recorded the quit claim deed, taking the overt, unequivocal act of asserting a right of ownership adverse to Joyce and beginning his attempt to oust her. He asserted in his pleadings, up to the date of trial, that he was the sole owner by quit claim deed and adverse possession. Where the value of Zintars' improvements was $27,500[6] and the rent sought by

---

[6] The main improvements were the conversion of the garage to an accessory living unit and the construction of a detached garage, which together added $27,500 in value.

Joyce was $31,480,[7] the trial court acted within its discretion in ordering that the proceeds from the sale of the Property be divided equally without awarding Zintars the value of the improvements.

Second, Zintars argues that the trial court retroactively modified the decree of dissolution when it failed to find that Joyce abandoned her obligations under the decree, awarding her a greater interest in the Property than she was entitled to receive. He notes that a trial court has no authority to modify even its own decree unless conditions justify the reopening of the judgment, citing Kern v. Kern, 28 Wn.2d 617, 619, 183 P.2d 811 (1947) and RCW 26.09.170(1).

We reject Zintars' contention that the trial court retroactively modified the decree of dissolution. The decree awarded one-half of the real property to Joyce and ordered her to pay the "[p]artnership liability on real property." Ex. 10(c). Her obligation to contribute toward the mortgage would take effect when she and Zintars recovered title. But for years, Zintars concealed the fact that he had recovered title from Otlans. By the time Joyce received title to the Property by order of the trial court, the mortgage had been paid off 12 years earlier. The trial court did not err in not ordering her to pay a mortgage that no longer existed, particularly, as we have explained, because Zintars' mortgage payments were

---

[7] The evidence at trial was that the fair rental value of the Property was $1,465 per month, $650 of which was from the accessory living unit. Thus, the fair rental value of the Property minus the improvements was $815 per month. At that rate, the total rent from January 2005 to January 2012 at the time of trial would amount to $68,460. Subtracting the taxes due over that period of $5,500 left a net rental sum of $62,960, half of which would be $31,480.

less than fair rental value and were offset by his beneficial use of the Property. Zintars also argues Joyce should be required to pay him $11,000, representing the alleged debt to Otlans stated in the decree of dissolution. But the trial court found that Zintars provided no proof he paid the sums due on the promissory notes and found that the notes were not for financing the Property because they were not secured. Furthermore, the quitclaim deed transferring title to Zintars stated that consideration was "assumption of liability only."[8] Ex. 8.

Finally, Zintars argues that the trial court erred in concluding that he repudiated the Partnership Agreement and in setting it aside. He cites cases and statutes, including the Revised Uniform Partnership Act, chapter 25.05 RCW, in arguing that partners owe each other duties and obligations and that Joyce breached those duties by failing to pay $150 per month under the Partnership Agreement.[9] He contends he should be credited with his contributions of money and labor since the execution of the Partnership Agreement.

But while Zintars asserts he did not repudiate the Partnership Agreement, he makes no argument as to why the evidence fails to support the trial court's determination that he did, and we agree with Joyce that the evidence supports

---

[8] The only liability associated with the Property was the mortgage in favor of Rainier Financial Services. Ex. 9.

[9] Specifically, Zintars cites RCW 25.05.150 in discussing a partner's rights and duties regarding contributions, liabilities, and profits; and RCW 25.05.330 in discussing the settlement of accounts and contributions between partners.

14

the court's determination.[10] A party's repudiation of a contract may be treated by the other as a breach that will excuse the other's performance. CKP v. GRS Const. Co., 63 Wn. App. 601, 620, 821 P.2d 63 (1991). Thus, Zintars' discussion of the principles that apply to partnerships is unavailing.

In sum, given the evidence before it, the trial court did not abuse its discretion in ordering the Property to be sold and the proceeds divided equally.

### Attorney's Fees on Appeal

Joyce seeks attorney's fees on appeal, citing RCW 26.09.140, Seals v. Seals, 22 Wn. App. 652, 590 P.2d 1301 (1979), and RAP 18.9(a).

Under RCW 26.09.140,

> [t]he court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorneys' fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment.

The statute also permits the award of fees on appeal. RCW 26.09.140.

While the statute applies to dissolution proceedings, this court in Seals upheld fees awarded under the statute to a wife in a post-dissolution partition

---

[10] Intent to repudiate a contract may be expressly stated or circumstantially manifested by conduct. CKP, 63 Wn. App. at 620. The evidence shows that Zintars did not intend to abide by the Partnership Agreement. Four months after the agreement, he recovered the Property in his name only, in contravention of the agreement. He then concealed from Joyce the fact that he had recovered the Property for 17 years. Moreover, he did not rent or sell the Property, as contemplated by the Partnership Agreement. Indeed, he admitted at trial that he did not want to sell the Property. Zintars' actions on the whole were in contravention of the agreement's purpose of purchasing, renting, and selling the Property.

action and also awarded her fees on appeal. Seals, 22 Wn. App. at 656-58.

There, several months after the parties divorced, the wife learned of undisclosed

property and brought a partition action. We explained that fees were permissible

under RCW 26.09.140 for several reasons. First, we noted that a trial court has

the duty to dispose of all of the property brought to its attention in a divorce case,

and that the partition action was a "continuation of the original dissolution action"

where the wife filed the action promptly after discovering the existence of

undisclosed property. Seals, 22 Wn. App. at 657. Second, we explained that fees

under RCW 26.09.140 were not precluded where it would be manifestly unjust to

follow the general rule that the court loses jurisdiction to award attorney's fees in

a dissolution proceeding after entry of the order of dismissal. Id. at 657-58.

Finally, we noted that a trial court does not exceed its authority to award

attorney's fees if the non-prevailing party acted in bad faith. Id. at 658.

We award fees on appeal to Joyce under RCW 26.09.140 and Seals.

While the Property was purportedly addressed by the decree of dissolution, her

partition action was nonetheless a continuation of the dissolution proceeding

because at the time the trial court entered the decree, neither the court nor Joyce

knew the true nature of the title to the Property: that it was in Zintars' name only.

Affirmed.

WE CONCUR:

Spearman, A.C.J.

Cox, J.